In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-2082 & 05-2368

JENNIFER FARFARAS,

*Plaintiff-Appellee,*

*v.*

CITIZENS BANK AND TRUST OF CHICAGO,
a corporation, ROBERT MICHAEL,
GEORGE MICHAEL, and NICHOLAS TANGLIS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 8720—**Harry D. Leinenweber**, *Judge.*

ARGUED NOVEMBER 10, 2005—DECIDED JANUARY 11, 2006

Before FLAUM, *Chief Judge,* and RIPPLE and SYKES, *Circuit Judges.*

FLAUM, *Chief Judge.* A jury awarded the plaintiff, Jennifer Farfaras, a judgment of $200,000 in compensatory damages and $100,000 in punitive damages against the individual defendants, Robert Michael, George Michael, and Nicholas Tanglis. The jury also awarded Farfaras a $200,000 judgment against Citizens Bank and Trust of Chicago, however, pursuant to 42 U.S.C. § 1981a(b)(3)(A), the district court reduced this latter award to $50,000.

In addition, the district court awarded Farfaras $436,766.75 in attorneys' fees and costs, plus $9,314.48 in lost wages.

The defendants now appeal. They request a new trial, claiming that unduly prejudicial evidence was admitted at trial. They also request a new trial or remittitur to reduce the damages awarded. Finally, the defendants advocate reduction of the attorneys' fees awarded.

For the following reasons, we now affirm the judgment of the district court.

## I. Background

The plaintiff-appellee, Jennifer Farfaras, filed the original claim in this case against Citizens Bank and Trust of Chicago ("Bank"), Michael Realty, Robert Michael ("Robert"), George Michael ("George"), and Nicholas Tanglis ("Tanglis") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Farfaras also sued for pendent common law claims of battery, intentional infliction of emotional distress ("IIED"), and assault. The district court granted summary judgment, dismissing all claims against Michael Realty and the Title VII claims against the individual defendants.

This case proceeded to trial on Counts I (battery), II (IIED), and III (assault) against each individual defendant, and on Count IV (sex discrimination) and Count V (sexual harassment) against the Bank. The jury found in Farfaras's favor on Counts I, II, III, and IV, but returned a verdict in favor of the Bank on Count V. On March 21, 2005, the district court denied the defendants' post-trial motions to set aside the verdict and to prevent the recovery of attorneys' fees. On April 15, 2005, the district court granted attorneys' fees to Farfaras.

Farfaras worked for twelve years in the banking industry as a branch manager and teller before being hired by

Citizens Bank. The Bank is located across the street from Michael Realty, which is owned by defendants Robert and George Michael. The Michael brothers are also majority shareholders of Citizens Bank. Robert is Chairman of the Board and CEO; George is a Director. Defendant Nicholas Tanglis is the President of Citizens Bank and recruited Farfaras.

Farfaras began working for the Bank on April 13, 1999. Her employment continued until October 20, 2000. Evidence adduced at trial showed that throughout this time, Farfaras was subjected to a steady stream of inappropriate comments and actions by each of the three individual defendants. Farfaras testified about her encounters with Robert,

> [He asked] what my ethnic background was. . . . I told him I was of Greek descent, and at that point he asked me if I cried when I found out. . . .
>
> [A]bout a month and a half into my employ-ment . . .[Robert] asked me if I was married or if I had a boyfriend, and he said that he didn't understand why I wasn't married or why I didn't have a boyfriend. He asked me if I was on drugs . . . an alcoholic . . . [or] if I was shopping at the malls too much. . . . [H]e said to me, "I don't understand why you're not married, you're like an angel." And he just kind of stared at me for a while, and he looked at me, and he said, "You know what, if only I was a little younger and Greek."

Farfaras also testified about her relationship with Tanglis and Robert's brother George. Farfaras stated that George also asked her about her Greek heritage and whether she "would have to [marry] a Greek boy?"

Farfaras further testified that on several occasions, Tanglis "asked me if I would be able to stay late," alone, in the closed bank. She told the jury that after talking about

business Tanglis stopped, stared at her, sat down next to her,

> And he proceeded to put his hand on my knee and rub my knee, and he would put his hand on my shoulder . . . and rub it, and he would tell me that we needed to go out to dinner and get to know each other better. . . .

> I told him that I didn't appreciate him putting his hands on me . . . I grabbed my purse, and I got up to leave . . . He met me at the door, and he was trying to block my way out. . . . I asked him to please move out of my way. He didn't. . . . [I] had to push him out of the way so I could leave. . . . [I felt v]ery humiliated and scared . . . [and] afraid that I was going to go to work the next day and not have a job. . . . [The next day, s]ame thing. . . . I got up, and I asked him not to do that anymore. . . . He got up, and again he went to the door, and he blocked my way. I asked him to please move out of the way, and this time he positioned himself sideways so I would have to turn my body sideways in order to exit that doorway. So depending on how I was positioned to exit, I would either be rubbing up against him, my front or back. . . .

> After about five or six times, I believe, I had enough, and I know that I was scared about losing my job, but at that point I didn't feel comfortable, safe, nor did I want to stay after work and be touched, so the last time he asked me to stay I told him that I was not going to be staying any longer[.]

The bank opened to the public on January 31, 2000. Farfaras would answer the phone at 9:00 a.m. every day when George would call. Farfaras testified that she began these conversations, "Good morning. Citizens Bank. This is Jennifer. Can I help you?" and George would answer, "Good morning Jennifer. Why don't you come over to my office and sit on my face[?]" In addition, Farfaras testified that George

would call throughout the day, often telling Farfaras that he wanted to "lick [her] like an ice cream cone" or birthday cake and that he wanted to "fuck" her. Farfaras testified that George "just laughed" when she told him, "Please don't talk to me like that. That's disgusting. I don't appreciate it."

Farfaras stated that she was often required to visit George Michael in his office and that during these visits he would "give [her] a perverted look" and make "grunting, mumbling, sucking noises . . . put his hand on [her] butt and start laughing, or he would put his hand on [her] leg, and he would run it up to lift [her] skirt."

Additionally, Farfaras described telephone conversations with George.

> [H]e would often tell me that he wanted to see me naked and that he wanted to fuck me and that he wanted his brother Robert to join in, he wanted to videotape the session so he could view it at a later date.
>
> He told me that if he wasn't married that he would make me marry him whether my father wanted it or not even though he wasn't Greek, and we would have a big Greek wedding and we would be dancing in a circle with scarves in the air. . . .
>
> [A]fter I had told him to stop talking to me like that, he would laugh, and he said to me, "You know what, my brother Bob and I have had so many sexual harassment complaints against us already that one more is not going to make a difference."

Farfaras related that these conversations continued throughout her employment.

Farfaras testified that in April of 2000, George cornered her in the bank's downstairs vault, grabbed her right arm, pinned her against the wall, and tried to kiss her.

When I saw his face coming at me, I turned my head, and instead of catching my lips, he caught half my cheek and half my lips. . . .

I screamed for him to get away from me, and I told him not to ever do that again. . . . He laugh[ed].

Farfaras also testified about George's actions on July 4, 2000, after George ordered Farfaras to come to a party at his house.

[E]verything was going okay until it was time for us to leave. . . . He had a sandwich in one hand . . . and he grabbed me with his other hand by my arm, and he pinned me up against the wall and while he had food in his mouth he kissed me. . . . I was thoroughly disgusted as usual, and I pushed him really hard, and I believe he fell, and I ran out.

Farfaras described to the jury the moaning, slobbering noises she claimed George made at her desk and told the jury that sometimes she would have to clean George's saliva off her desk after he left. She testified that after handing Farfaras deposits, George would follow her to the teller station, then use his elbow to hit her breasts and place his hand on her backside. Farfaras further testified about her feelings after these incidents.

It was very degrading and very embarrassing. I felt humiliated. I felt that he just was controlling me, I didn't have a right to speak up and say stop it and don't do it. And I didn't appreciate the fact that he was putting his hands on me when I didn't ask him to, and I didn't appreciate the fact that he wasn't listening to me when I said no.

Farfaras also testified about her interactions with Robert Michael.

[H]e stated to me that he—the first time he saw me he said that he knew that I would be trouble for him

but he didn't care because he already had enough trouble anyway so he didn't mind. . . . [H]e would begin to tell me that I was the most beautiful Greek girl he had ever seen and that normally Greek women are not beautiful, they look like Greek men, and he asked me why I'm proud of being Greek, there's really nothing to be proud of.

The defense objected, claiming that the district court had already ruled out ethnic comments, but the district court found these comments, as well as other comments concerning Farfaras's heritage, to be related to the ongoing sexual harassment. Farfaras testified that Robert went on to ask why Greeks are proud of Greek Town, which he described as "just a bunch of little restaurants" and stated that "the Jews have something to be proud of" because of the Magnificent Mile. She also testified that Robert told her that,

[H]e knew that I liked him because he could see it in my eyes and that he just wanted to let me know that he liked me too. And he told me that we needed to get to know each other better. . . . He told me that he had a boat and that it's a beautiful boat and I should consider spending the weekend on his boat . . . fucking under the stars.

Farfaras claimed that in order to protect her job, she was cautious in how she answered these comments and that she often felt ready to cry after speaking with Robert.

Farfaras told the jury that all three men, Tanglis, Robert, and George "had a habit of" putting their body against hers and brushing against her, frequently in the small kitchen area, where they would block the single doorway to make her walk past them.

In October of 2000, Farfaras was fired. Although she could have begun a new job in December, Farfaras did not begin her new employment until January 8, 2001. The

salary in her new position was equivalent to her previous income.

Beata Blaszczyk worked at the bank from 1999 to September of 2000 as a teller. She testified that she heard George Michael making moaning noises once or twice a day at Farfaras's desk and saw George grab or fondle Farfaras in the presence of Tanglis and Robert.

Farfaras and other witnesses testified that as a result of the defendants' actions, Farfaras lost self-esteem, gained weight, had problems sleeping, changed demeanor, and became nervous. Although Farfaras never consulted a medical professional about her unhappiness, Farfaras's friend Yonia Yonan testified that Farfaras had been "very depressed" beginning early in the year 2000. The defendants objected to the use of the word "depressed." The district court overruled this objection.

On September 2, 2004, the jury awarded Farfaras $100,000 for loss of dignity, humiliation, and emotional distress, $100,000 for pain and suffering, and $100,000 in punitive damages against the three individual defendants. On Count IV, the jury awarded $200,000 in damages against the bank for emotional distress and humiliation. Pursuant to 42 U.S.C. § 1981a(b)(3)(a), the district court reduced the $200,000 award under Title VII to the statutory maximum of $50,000 for a business the size of Citizens Bank. The plaintiff proved $9,314.48 in lost wages. The district court reduced this award to $6,752.90 on defendants' oral motion. In all, the damage award on September 8, 2004, totaled $356,752.90.

On September 17, 2004, defendants filed a post-trial motion for a new trial or remittitur of damages. Four days later, Farfaras filed a motion to reinstate lost wages of $9,314.48. Defendants' motion was denied and plaintiff's motion was granted on February 8, 2005.

The district court extended the deadline for filing a joint submission regarding attorneys' fees under Local Rule 54.3(e). Despite this extension, no *joint* statement was ever filed. The parties did, however, communicate their arguments regarding attorneys' fees and costs to the district court. In an unsigned statement, the plaintiff requested $501,338.68 in attorneys' fees and costs; the defendants suggested that the total amount should be $69,334.25. Although the defendants failed to comply with the local rules, the district court allowed them to submit their objections and evaluated the arguments as to the propriety of specific fees and costs. Farfaras's attorney submitted a statement with leave of the district court, reiterating his request for $501,338.68 in attorneys' fees and costs.

Farfaras supported her claim for attorneys' fees with affidavits stating the reasonableness of her attorney's billing rate of $325 per hour, submission of the invoices she received, and an affidavit stating she had paid counsel $466,054.28 to date. The defendants contested the award of fees for certain activities, block billing, and duplicative or otherwise improper billing procedures. On April 15, 2005, after reviewing the arguments made by both parties, the district court awarded Farfaras $436,766.75 in attorneys' fees and costs.

## II. Discussion

### A. Admission of Evidence at Trial

This Court reviews claims of improperly admitted evidence for abuse of discretion. *United States v. Hernandez*, 330 F.3d 964, 969 (7th Cir. 2003). Trial judges have greater familiarity with the witnesses and evidence as a whole,

> Consequently, we will reverse a decision on admissibility of evidence only if the trial court has "clearly abused its discretion," which typically occurs only

"where no reasonable person could take the view adopted by the trial court." Further, where the alleged error of admission occurred during the trial . . . we "will grant a new trial only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice."

*Id.* (citing *United States v. Hughes*, 970 F.2d 227, 232 (7th Cir. 1992); *United States v. Walton*, 217 F.3d 443, 449 (7th Cir. 2000)).

*1. Statements Concerning Ethnicity/Nationality*

Discrimination based upon ethnicity, race, or country of origin is not a necessary element for a claim of sexual harassment or sexual discrimination. *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (describing the elements necessary to create a "hostile work environment"); *see also Bryson v. Chi. State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996) (describing the elements necessary to demonstrate that quid pro quo sexual harassment has occurred).

In the instant case, however, the comments concerning Farfaras's Greek ancestry were intertwined with sexual harassment. The defendants used her heritage as a qualifier in the course of their harassment ("[H]e would tell me again about me being the most beautiful Greek woman that he's ever met, and he told me that, again, most Greek women are—look like Greek men[.]"), as a method of belittling Farfaras and leaving her susceptible to sexual attacks (insulting Greek Town directly before crudely propositioning Farfaras to have sex on the defendant's boat), and claiming that her country of origin was the only thing keeping her from him ("[I]f only I was a little younger and Greek."). We find that the district court acted properly in allowing this testimony.

In addition, given the large body of evidence presented at trial demonstrating the defendants' discriminatory conduct, there is no evidence to suggest that hearing the defendants' comments had a "'substantial and injurious effect or influence' on the jury's verdict." *See United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993) (citation omitted). Given the egregious nature of the defendants' sexual comments, we do not believe that the defendants' less severe, discriminatory comments had an injurious effect or prejudiced the jury's verdict. *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998).

It is the appellants' burden to show that, without this testimony, a different outcome would be likely. The appellant has admitted, "It is impossible to gauge the subject testimony's prejudicial impact on the jury." Where the impact of a statement is "impossible to gauge," the district court's admission of the statement is not an abuse of discretion.

Regardless of whether a motion in limine originally barred the presentation of evidence concerning the defendants' discriminatory conduct, the district court may adjust a motion in limine during the course of a trial. *Luce v. United States*, 469 U.S. 38, 41-42 (1984). The district court found that when a conversation that began with ethnic/religious comparisons and insults continued into a sexual conversation, the jury should be allowed to hear the context of the sexual harassment. This decision was not an abuse of discretion.

Finally, the testimony regarding Farfaras's national origin was relevant to the intentional infliction of emotional distress alleged by Farfaras. *See Figueroa v. City of Chicago*, 2000 WL 520926, at *2 (N.D. Ill. Apr. 24, 2000).

*2. Testimony Concerning Medical, Emotional, and Psychological Conditions*

The defendants seek a new trial based upon their claim that the district court improperly allowed Yonia Yonan, a layperson, to describe Farfaras's mental condition as "depressed." Not only was Yonan's description of Farfaras elicited from the defendants' own cross-examination, *see United States v. Duff*, 551 F.2d 187, 189 (7th Cir. 1977), but there is nothing in the record to indicate the jury would have believed Yonan was offering a clinical opinion or professional evaluation.

A witness may testify to relevant evidence that is "rationally based on the perception of the witness . . . and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. While "depressed" does have a medical definition, a reasonable jury can be expected to understand the difference between lay use of an adjective and an expert's use of the same word to describe a specific psychological condition.[1]

Despite the defendants' request, the district court refused to instruct the jury that they should disregard the word "depressed." The district court also denied the defendants' claim that the use of the word "depressed" represented an outcome-determinative legal conclusion on the issue of intentional infliction of emotional distress. The jury was well aware that Yonan's testimony was not that of an expert. The district court did not abuse its discretion by denying the request for an instruction and allowing the testimony to stand.

---

[1] The Dictionary provides several definitions for the adjective "depressed." The first entry states, "low in spirits : SAD; *specif* : affected by psychological depression." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 341 (1990). A jury is capable of differentiating between the general definition of "low in spirits" and the more specific entry that involves psychological expertise.

### B. Compensatory Damages

"This [C]ourt reviews a district court's denial of a motion for remittitur or a new trial on damages for an abuse of discretion." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003) (citations omitted).

The district court and jury are in a superior position to find facts and determine a proper damages award. The jury awarded Farfaras $200,000 in compensatory damages. This award was composed of $100,000 for pain and suffering and $100,000 for the loss of dignity, humiliation, and emotional distress caused by the three individual defendants. The district court denied the defendants' motion for a new trial on compensatory damages and their motion for remittitur.

The district court granted proper deference to the jury's verdict and limited its inquiry to three questions: "whether the award is 'monstrously excessive'; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas[;] and whether the award is roughly comparable to awards made in similar cases." *Farfaras v. Citizens Bank & Trust Co.*, 2005 WL 670523, at *4 (N.D. Ill. Mar. 21, 2005) (quoting *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1985)); *see also Lampley*, 340 F.3d at 483-84.

Although there was no extensive psychological or medical testimony presented in this case, the jury heard Farfaras and her witnesses describe the impact of the defendants' actions. Medical support is not necessary to prove emotional injury in a Title VII case. *See David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 923 (C.D. Ill. 2002) ("It is well-settled that Title VII plaintiffs can prove emotional injury by testimony without medical support."); *see also Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 580 (7th Cir. 1996).

The jury is capable of evaluating the impact of the defendants' egregious conduct upon Farfaras. The jury's award was rationally related to the repeated physical and verbal harassment Farfaras suffered. Furthermore, there is no evidence whatsoever that the award in this case was a "product of the jury's fevered imaginings or personal vendetta." *See AIC Sec. Investigations, Ltd.*, 55 F.3d at 1285.

Although we cannot completely analogize the damage award in this case to an identical case with either a similar or dissimilar verdict, such an exact analogy is not necessary. "Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive." *Lampley* 340 F.3d at 485. Some of the cases presented by the defendants appear more egregious with lower damages, while some of the cases presented by Farfaras appear less egregious with higher damages. Our responsibility, however, is not to fit this case into a perfect continuum of past harms and past awards. Rather, our role in reviewing awards for abuse of discretion is to determine if the award in this case was roughly comparable to similar cases, such that the instant award was not so beyond the pale as to constitute an abuse of discretion. We conclude that the award in this case was roughly comparable to previous awards and therefore the district court's decision to uphold the jury's award of compensatory damages was not an abuse of discretion.

## C.  Punitive Damages

The defendants appeal the jury's award of punitive damages, claiming the district court erred by refusing to reduce the $100,000 punitive damage award against the defendants or grant a new trial on the issue of damages.

This Court has enunciated "three guideposts" to steer the evaluation of "whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004) (citing *BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

The district court evaluated this case using the "three guideposts" model specified in *Kapelanski* and *BMW*. When these three guideposts are not followed and a punitive damage award is "grossly excessive," due process has been offended. *Id*. We agree with the district court's assessment that the defendants' conduct was extremely reprehensible. The defendants acted with impunity, using their positions of power to take advantage of and harm Farfaras.

The punitive damages award in this case is not duplicative of the compensatory damages award. Instead, the award is calculated to achieve one of the goals of punitive damages: deterrence of similar future conduct. *See AIC Sec. Investigations, Ltd.*, 55 F.3d at 1287. The defendants openly boasted of their substantial wealth and indicated their belief that this wealth allowed them to flout the law and harass a young woman. One purpose of punitive damages is to dissuade defendants who are unaffected by compensatory damages from the misapprehension that they are beyond the reach of civil penalties.

Unlike prior cases in which this Court has reduced a jury's award of punitive damages, the punitive damages award in this case was less than the total compensatory damages. During oral argument, counsel for the appellant could not cite a single case in which this Court struck down a punitive damages award of half the total

compensatory damages award as constituting too great a disparity between the harm suffered and the punitive damages awarded.

"[S]tatutes routinely provide for double and treble damages awards to deter and punish.*" Id.* While comparing damages in one case to damages in another is not dispositive, it may provide a useful guide. *See supra* II.B. This Court has often enforced punitive damages similar in size to the award in the instant case. *See, e.g.*, *AIC Sec. Investigations, Ltd.*, 55 F.3d at 1287; *Hamed v. Gen. Accident Ins. Co.*, 842 F.2d 170, 174-75 (7th Cir. 1988); *Williamson v. Handy Button Mach.*, 817 F.2d 1290, 1296 (7th Cir. 1987).

### D.  Lost Wages

The defendants contend that Farfaras failed to mitigate damages by immediately beginning work in a comparable position, and that we should therefore reduce the award of lost wages to exclude the period of time during which Farfaras could have been working, but was not. Although in December Farfaras could have begun a new job similar to the job she held at Citizens Bank, she did not begin her new employment until January 8, 2001. The question of whether the district court should have awarded Farfaras lost wages for the period in dispute hinges on whether the defendants raised this issue at trial.

There is no dispute that Farfaras's alleged failure to mitigate was not raised in the pleadings or explicitly at trial. The defendants claim that the issue of failure to mitigate was raised by implication. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." FED. R. CIV. P. 15(b).

The intent of rule 15(b) is "to provide the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties."

The key factor in determining whether the pleadings have been amended is whether the issue has been tried with the express or implied consent of the parties. The test for such consent is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel.

*In re Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) (citations omitted).

The district court found that rule 15(b) did not apply because, "Defendants did not prove, or even raise the issue, of the failure to mitigate damages at trial. Thus, Defendants have waived their right to assert it now." As a result of this ruling, the district court granted Farfaras lost wages of $9,314.48, rather than the $6,752.90 suggested by the defendants.

The defendants claim implied consent arose when Farfaras did not object to cross-examination questions regarding the timing of her return to work. Farfaras admitted during cross-examination that her decision "not to go to work right away" was voluntary. This testimony, combined with Farfaras's statement that she could have started her next job in the middle of December, but chose to wait until January was not sufficient to demonstrate that the defense had raised the issue of failure to mitigate.

A district court's determination of an award for lost wages is reviewed for clear error. *See Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990). The trial testimony at issue is open to multiple interpretations. By questioning the

reasons behind Farfaras's decision to postpone returning to work, the defendants may have been raising the issue of mitigation of damages, or they may have been attempting to demonstrate that there was no long-lasting damage to Farfaras, thereby lessening damages for emotional distress. What issue was being addressed by defense counsel's questions is a question of fact for the district court.

The district court's interpretation of the purpose of defense counsel's question was reasonable. Having observed the entire trial, the district court was in the best position to determine whether or not the issue of failure to mitigate was raised. We see no error in the district court's finding that the defendant did not raise the issue of mitigation. Therefore, the district court's award of lost wages will be left undisturbed.

### E.  Attorneys' Fees

A district court may in its discretion award attorneys' fees for an action under Title VII. *See* 42 U.S.C. § 2000e-5(k). We review the district court's award of attorneys' fees and costs for abuse of discretion. *See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1311 (7th Cir. 1996).

> In reviewing the district court's determination of attorneys' fee awards, our standard is a "highly deferential abuse of discretion standard." The district court is accorded significant deference in fee matters because: (1) it possesses "superior understanding of the litigation and [there exists a] desirability of avoiding frequent appellate review of what essentially are factual matters."; (2) the need for uniformity in attorneys' fees awards is not great enough to warrant appellate review of minutia; and (3) the desirability of avoiding "a second major litigation" strictly over attorneys' fees is high.

*Spellan v. Bd. of Educ. for Dist 111*, 59 F.3d 642, 645 (7th Cir. 1995) (alteration in original) (citations omitted).

The district court properly utilized the lodestar method for determining attorneys' fees. The lodestar figure is arrived at by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate. The defendants have not challenged the $325 hourly fee charged by Farfaras's attorney.

The attorneys' fees in this case were substantial. The district court awarded a total of $436,766.75 in attorneys' fees and costs. The defendants claim that the award should be reduced by $285,037.50 (65.3%) or some portion thereof. Although Farfaras originally requested $501,338.68 in fees and costs, she has not cross-appealed or objected to the district court's reduction.

We begin our analysis of the defendants' claim for a reduction by noting that the parties did not comply with Local Rule 54.3 of the Northern District of Illinois. Defendants' counsel claimed before the district court that its billing records were irrelevant. This position is inconsistent with the letter and spirit of Local Rule 54.3. The rule's purpose is to avoid exactly the type of hypocritical objections presented by the defendants. Although the defendants object to the use of block billing and "vague" descriptions by Farfaras's counsel, the defendants' counsel used similarly vague descriptions and block billing. Although "block billing" does not provide the best possible description of attorneys' fees, it is not a prohibited practice.

Despite the parties' failure to comply with Northern District of Illinois Local Rule 54.3(d)(5), the district court engaged in a thorough analysis of Farfaras's attorneys' fees and costs. Where the defendants did address specific fees and costs, the district court discussed every objection except those that were "so without merit that they [did] not require a detailed discussion." In all, the district court reduced

Farfaras's attorney's billable time by 80.5 hours and a law clerk's billable time by 35 hours. Additionally, $1,551.93 in costs were disallowed.

The district court was in a superior position to observe the work of the attorneys in this case and appraise the appropriate value of their services. Its analysis of the fees and costs was fair, carefully measured, and far from an abuse of discretion.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*