In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 07-1004, 07-1005 & 07-3030

S. ALEJANDRO DOMINGUEZ,

*Plaintiff-Appellee,*

*v.*

PAUL HENDLEY and CITY OF WAUKEGAN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2907—**Milton I. Shadur**, *Judge.*

ARGUED MAY 30, 2008—DECIDED SEPTEMBER 30, 2008

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In September 1989, when Alejandro Dominguez was fifteen years old, he was arrested on charges of home invasion and sexual assault, based on the allegations of eighteen-year-old Lisa Kraus, who lived in the same building as he did. Dominguez was convicted and spent four years incarcerated before being paroled. Throughout this process and the period following his release, he maintained his innocence and worked to

exonerate himself. With the help of a new lawyer, Dominguez eventually proved that his DNA did not match the semen found on Kraus's underwear, and on April 26, 2002, his conviction was vacated. In August 2005, Dominguez received a pardon from the Governor.

On April 23, 2004, Dominguez filed a complaint under 42 U.S.C. § 1983 against the City of Waukegan and the police officers—in particular Officer Paul Hendley—involved in the investigation of the incident with Kraus. After the complaint was amended more than once to add parties and claims and drop parties who had died, the case went to trial with only Hendley and the City as defendants. After all evidence was submitted to the jury but before the jury rendered its verdict, the district court dismissed the City from the suit, based on a failure of proof, but with the express understanding that the City was bound to indemnify Hendley for any judgment incurred. After a ten-day trial, the jury found in favor of Dominguez and awarded him a judgment of $9,063,000, based on its finding that Hendley had violated Dominguez's right to due process by taking actions that denied him a fair trial. At that point, the City repudiated its prior position and stated that it might not indemnify Hendley, prompting Dominguez to move for post-judgment relief. Based on the City's judicial admissions on the issue of indemnification, the district court reinstated it as a defendant and amended the judgment to make Hendley and the City jointly and severally liable for the judgment in favor of Dominguez. Hendley and the City appeal, and we affirm.

## I

Hendley's first argument on appeal is that Dominguez's claim is barred by the statute of limitations. We review a district court's ruling with respect to a limitations defense *de novo*. *United States v. Gibson*, 490 F.3d 604, 608 (7th Cir. 2007).

In Illinois, the statute of limitations for § 1983 claims is two years. See 735 ILCS 5/13-202; *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005). Dominguez filed his complaint on April 23, 2004, and so if his claim accrued on or after April 23, 2002, then his lawsuit was timely. His conviction was vacated on April 26, 2002, which falls within this window. The real question is whether that is the proper event on which to focus.

The jury was instructed to find for Dominguez if it found that the defendant caused Dominguez's criminal trial to be unfair. A § 1983 claim for a due process violation based on the denial of a fair criminal trial may be brought only after the conviction is set aside. Otherwise, that civil claim would imply the invalidity of the outstanding conviction and would thus constitute a collateral attack on the conviction through an impermissible route. *Heck v. Humphrey*, 512 U.S. 477 (1994). So viewed, Dominguez's claim did not accrue until 2002 and is therefore timely.

Hendley argues, however, that the underlying reason why Dominguez asserts that his trial was unfair relates to his arrest, and thus we should find that his claim accrued no later than the time when his unlawful seizure was terminated—that is, the time of his arraignment. Fourth

Amendment claims for false arrest or unlawful searches accrue at the time of (or termination of) the violation. *Wallace v. Kato*, 549 U.S. 384 (2007). Even if no conviction could have been obtained in the absence of the violation, the Supreme Court has held that, unlike fair trial claims, Fourth Amendment claims as a group do not necessarily imply the invalidity of a criminal conviction, and so such claims are not suspended under the *Heck* bar to suit.

Hendley, however, is assuming that Dominguez's claim is limited to his arrest and does not also include independent charges of due process violations. That assumption overlooks critical parts of the case. Dominguez has asserted all along that the defendant officers violated his right to due process by manipulating or tampering with identification and testimonial evidence. He backed up these allegations with evidence at the trial. His due process claim is thus more than a Fourth Amendment claim by another name, and for that reason, it is not barred by the limitations rule announced in *Wallace.* Dominguez's right to sue arose only after his criminal conviction was set aside, and, as the district court held, he filed within the two years permitted by law.

## II

Hendley next argues that he was entitled to qualified immunity because he did not proximately cause any constitutional violations at Dominguez's criminal trial. It is somewhat unusual to encounter a qualified immunity defense this late in the proceedings, because qualified

immunity is normally raised during the pretrial phase so that the public official can avoid the burdens of trial. It is technically possible, however, to raise the defense after a jury verdict, if the immunity question itself depended on disputed issues of material fact. See *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

In this case, the defendants raised the defense of qualified immunity in their answer, but they did not move for summary judgment. This was a reasonable way to proceed, because Hendley denied that he had engaged in the misconduct of which Dominguez accused him: withholding material exculpatory evidence from the defense and prosecutor, orchestrating a show-up identification procedure that caused the criminal trial to be unfair, and fabricating evidence against Dominguez. There was and is no disputing that such conduct violates clearly established constitutional rights. Hendley merely hoped that the jury would credit his version of what happened rather than Dominguez's.

Hendley's biggest problem is that qualified immunity is a doctrine designed to respond to legal uncertainty, but causation (a factual matter) has nothing to do with *legal* uncertainty. His contention about a lack of "proximate cause" is really just an assertion that the evidence was insufficient to support the jury's finding that his conduct proximately caused Dominguez's damages. Citing cases discussing proximate cause and superseding cause in § 1983 claims, Hendley asserts that "numerous circuits have held that police officers who provide truthful information to subsequent decisionmakers in the criminal

justice system cannot be held liable under § 1983 for allegedly wrongful convictions." Quoting from *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999), he argues that the supervening cause doctrine applies "in 'the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment.'" These cases are of no help to Hendley, however, for they merely highlight the differences between those cases and Dominguez's.

Dominguez submitted sufficient evidence at trial to allow the jury to find that Hendley *did not* provide truthful information to subsequent decisionmakers, and that he *did* mislead the official who could be expected to exercise independent judgment. For example, the criminal prosecutor testified that he was never told about any showup used in Kraus's identification of Dominguez. Dominguez also proved that Hendley received an exculpatory document, known to the parties as the "Navy Report," but that this report was missing from the official file that had been provided to the prosecutor during the criminal trial, and was not part of the materials furnished to Dominguez in discovery. The Navy Report would have provided valuable exculpatory evidence for Dominguez. After Kraus was allegedly sexually assaulted, she visited a Navy hospital and was interviewed about the incident. The account that she gave to the naval officer differed in significant ways from accounts she later gave in the investigation of the incident. Hendley denied that he arranged a showup, and denied that he had ever seen the exculpatory Navy Report. The jury therefore had to decide who was telling the truth on these points, and

ultimately whether Hendley misled the prosecution and caused Dominguez to receive an unfair criminal trial. This determination had nothing to do with qualified immunity.

Hendley also argues that Dominguez has not proved that Hendley arrested him without probable cause. This would be relevant only if the verdict were based on a false arrest claim, but it was not. Even supposing Hendley did have probable cause at the time of arrest, the question is whether Hendley took actions (whether before or after the arrest) that caused Dominguez to receive an unfair trial. Probable cause at the time of arrest would not sanitize such acts.

## III

The jury was instructed that, in order to find for Dominguez, it had to find that Hendley caused Dominguez's criminal trial to be unfair through any of three specified courses of conduct: (1) withholding material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) causing an unreliable identification procedure to be used at his trial; or (3) fabricating evidence. Hendley argues that the first of these—the *Brady* basis—should not have been submitted to the jury. He contends that Dominguez failed adequately to plead and support that theory, and also that he failed to prove it at trial. Neither point has merit.

Fundamentally, the first point overstates the importance of pleadings by the time a case reaches trial. The purpose

of a complaint is to put the defendant on notice of the claim that is being asserted against him, her, or it; by the time of trial, the case has normally proceeded through discovery and the parties have provided whatever notice of their trial issues and evidence the district court ordered. This record suggests no lack of notice to Hendley or the City. They did not object to Dominguez's evidence at trial about the *Brady* violations—indeed, that evidence was a prominent part of the trial. The defense submitted evidence that materials were not withheld from the criminal prosecutor. As Dominguez points out, even if something is missing entirely from the pleadings, it can be tried by consent. See FED. R. CIV. P. 15(b) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue."). The record easily shows that supposed flaws in the way that Dominguez described his *Brady* point in the pleadings had no effect on the trial.

Hendley's assertion that the evidence was insufficient to support Dominguez's *Brady* theory is also unpersuasive. Once again, Hendley must show that no matter how the evidence is weighed or credited, no reasonable jury could have found by a preponderance that he withheld material exculpatory evidence from Dominguez when Dominguez was being criminally prosecuted. The trial record simply does not support such a conclusion, given

Hendley's failure to disclose the showup and the Navy Report.

## IV

Hendley next attacks the court's instructions to the jury. He has three complaints. First, he argues that the court erred in not giving his proposed instruction reminding the jury that Hendley may be held accountable only for conduct in which he was personally involved, not for what others did or did not do. He accuses Dominguez of trying to blur the lines by laying all responsibility at Hendley's feet, referring to "they," and characterizing the investigation as Hendley's. The district court declined to give the proposed instruction because the instruction it had already given referred only to results caused by Hendley. The plaintiff was entitled to try to prove Hendley's responsibility for various acts, and Hendley had the opportunity to disclaim control, involvement, or responsibility and convince the jury not to find him liable.

Hendley thinks, however, that the jury remained confused on this point, and as proof he points to the question it submitted to the judge during deliberation: "If we get to the point of considering damages, do we consider the total amount of damages or do we conclude the amount of damages in light of the degree of possible wrongdoing of the defendant." At that point, Hendley renewed his request for an instruction on personal involvement, but the court decided to give the jury a proximate cause instruction.

The jury's question does not necessarily show that they were considering assigning liability to Hendley for the acts of others. It might have suggested that they were thinking of discounting his liability to take into account the actions of others. Under ordinary principles of tort law, the fact that tortfeasor A's negligent act proximately caused $100 in damages means that A is liable for the entire sum of $100, even if co-tortfeasor B could also have been liable for that same amount (with no double collection by the victim, of course). Not only does this explanation undermine Hendley's claim that his instruction was necessary to clear up confusion, it also supports the district court's decision to respond to the question by giving a proximate cause instruction.

Second, Hendley claims that the court erred by failing to instruct the jury that Hendley had no post-arrest duty to investigate. This argument is premised on Hendley's effort to characterize Dominguez's claim as exclusively based on false arrest. Because it is not, and because Dominguez presented evidence from which a jury could conclude that Hendley engaged in post-arrest conduct (like manipulation of evidence) that deprived Dominguez of a fair trial, Hendley's proposed instruction on "no post-arrest duty to investigate" was inappropriate and the district court properly rejected it.

Finally, Hendley claims that the elements instruction was erroneous because it failed to discuss superseding cause, improperly submitted the *Brady* theory, and failed to limit recovery to the period of incarceration between arrest and arraignment as contemplated by this court's

decision in *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006), *aff'd on other grounds sub nom. Wallace v. Kato*, 549 U.S. 384 (2007). But the court gave a proximate cause instruction, and so Hendley was not prejudiced by the absence of an instruction discussing superseding cause. We have already explained why there was no error in the court's treatment of the *Brady* issue. Finally, with respect to the proper recovery period, the district court correctly concluded that the limitation Hendley proposed was not appropriate, since Dominguez's claim was for deprivation of a fair trial rather than false arrest. The district court did hold that damages for any unlawful seizure of Dominguez had to be directly related to his thirteen days of detention preceding indictment, but that was prior to this court's issuance of *Wallace v. City of Chicago*, when the circuits were split on the time of accrual of Fourth Amendment claims, and certainly prior to the Supreme Court's affirmance in *Wallace v. Kato*. Thus, at the time, Dominguez's Fourth Amendment claim was still a potential theory of recovery. The district court specifically noted that its ruling "would not serve as a limitation on the admissibility of evidence as to the state law claims included in Dominguez's Complaint that are to be resolved in the same trial as his Section 1983 Fourth Amendment claim." Hendley points out that the court "failed to recognize that the only state law claims were asserted against Kraus and McCandless, both of whom had already been dismissed." The district court might inadvertently have referred to state law claims while meaning to allude to claims other than the Fourth Amendment claim, namely, the federal due process claim. In any event, the Fourth

Amendment claim was eventually dismissed as time-barred and only the due process claim remained. After that, Hendley's proposed recovery-period limitation was no longer an appropriate instruction.

## V

Hendley's final argument is that the cumulative effect of a number of trial errors deprived *him* of a fair trial, and thus the district court abused its discretion when it denied his motion for a new trial. We will examine each alleged error individually; if we find two or more errors, we will assess the cumulative effect to determine whether the district court abused its discretion in not granting a new trial. See *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001).

Each error alleged by Hendley is itself subject to the abuse of discretion standard. See *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006) (evidentiary rulings); *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1444 (7th Cir. 1995) (enforcement of a pretrial order); *United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002) (improper remarks by counsel); *United States v. Vasquez-Ruiz*, 502 F.3d 700, 704 (7th Cir. 2007) (potential juror bias). Once again, he faces an uphill battle because of the standard of review.

Hendley first raises a number of complaints about things that Dominguez's lawyer did during the trial. For example, he argues that the lawyer, in his opening and closing remarks and witness examinations, misstated

facts and misled the jury. First, he objects to the fact that counsel called Hendley a "bad officer." We do not believe that the district court abused its discretion in letting the remark stand. The language involved here is hardly inflammatory, and much of Dominguez's case involved trying to prove that Hendley engaged in a deliberate frame-up of Dominguez; a fleeting reference to his being a "bad officer" seems rather trivial in light of the whole record and unlikely to influence the jury if it was not otherwise inclined to credit the evidence against Hendley.

Next Hendley complains that Dominguez's counsel misled the jury by referring to "they," so as to obscure who was responsible for what actions. For example, counsel said things like "they interrogated [Dominguez]," and "they kept him there all night and deprived him of a lawyer." Hendley points out that, for example, it was Officer Marquez rather than Hendley who interviewed Dominguez. Nonetheless, we conclude that the district court did not abuse its discretion in allowing these remarks, because Dominguez was not misleading the jury if he could show that these acts were taken under Hendley's direction. The defense was free to point out who engaged in the physical acts and to refute the contention that Hendley was leading the investigation. Most importantly, the jury was instructed to find for the plaintiff only if *Hendley* caused the denial of a fair trial. The district court was entitled to take the position that this was sufficient to eliminate the risk that the jury would find Hendley liable for acts for which he had no responsibility.

In addition, Hendley believes that Dominguez's counsel confused the jury about when exactly Hendley became

aware of various facts relating to Dominguez's criminal case. This argument relies on Hendley's insistence that information available only after the time of arrest is irrelevant. Once again, this flows from Hendley's refusal to acknowledge that the trial was about the deprivation of a fair criminal trial for Dominguez, not about the alleged false arrest.

Hendley also argues that questioning Mr. Carter, Dominguez's criminal defense attorney, using hypotheticals because Carter could not remember Dominguez specifically, was improper, but he cites no authority in support of this position. He also argues that Carter's claim—that Carter would have used the alleged *Brady* material to support Dominguez's criminal de-fense—is undermined by the fact that Carter did not use any of the documents that actually were provided. We see no error here: it was up to the jury to decide what weight, if any, to give to Carter's testimony.

Hendley's next set of arguments relates to the district court's decision to enforce the final pretrial order strictly against the defense (as he sees it), but not against the plaintiff. He points out that when the defense took issue with the fact that Dominguez did not include the *Brady* issue as a contested issue of law in the final pretrial order, the court said, "we don't need that as part of the final pretrial order"; by contrast, certain defense objections during trial were overruled because the defense had not objected to the admission of the exhibits listed on the final pretrial order. The *Brady* issue was a factual one rather than a legal one, and so we see no error there. The

fact that the pretrial order form did not have the customary spaces in which to indicate an objection does not relieve a party from the duty to notify the court in a timely manner that it objects.

Hendley also asserts that the district court should not have admitted a document referred to as the "Chancey Memo," because the memo was speculative, irrelevant, and highly prejudicial. This was a memorandum written by Matt Chancey, chief of the felony division of the Lake County State's Attorney's Office. The memo informed prosecutors that their obligation to scrutinize cases carefully was "especially true in the case of Officer Hendley because of the questions which exist about his credibility." The Chancey Memo directed those reviewing felony cases to (1) refuse to approve cases involving confessions supposedly obtained by Hendley without recorded or written confessions unless the case is prosecutable without the confession; (2) refuse to approve charges in cases where Hendley interviewed key witnesses, until the accuracy of the purported statements was verified; (3) require corroboration in any case where Hendley handled physical evidence or would be called to testify about his observations.

Naturally, this was quite prejudicial, but the question is whether it was unfairly prejudicial. The claim against the City was still alive during the trial, and this memo was relevant and highly probative for the question whether the City of Waukegan was aware that there were problems with Officer Hendley. The district court did not abuse its discretion in admitting the Chancey Memo.

Hendley claims that it was error for the district court to limit the defense's examination of the prosecutor from Dominguez's criminal case. This inquiry was important to him, he says, because the procedures followed by the prosecutor would have helped support Hendley's defense that other actors were superseding causes of the wrongful conviction, or equivalently, that Hendley did not proximately cause it. A look at the record shows, however, that the district court was simply managing the trial appropriately. The defense's examination of this witness took up 114 trial-transcript pages, and Hendley has not shown that the district court abused its discretion in urging defense counsel to stay on track and refrain from confusing the jury.

Hendley also complains about a grab-bag of "prejudicial testimony." He objects to the amount of evidence that Dominguez's attorney elicited about Dominguez's innocence and the inadequacy of the facilities where he was detained. But this information was relevant to liability and damages, and the district court had no reason to exclude it. Hendley also objects to Dominguez's attempt to blame Hendley for the actions and omissions of others, but we have already explained why this does not accurately reflect Dominguez's purpose. Hendley also tries to find fault with the fact that Dominguez urged the jury to credit certain parts of Lisa Kraus's testimony, while painting her as a liar with regard to other matters. There is nothing improper about this. He also claims that Dominguez misled the jury by pushing the theory that Hendley should have continued investigating up to the

time of Dominguez's criminal trial. But this is just another variation on Hendley's theme that any events subsequent to Dominguez's arrest are irrelevant, so long as there was probable cause at the time of arrest. This argument lacks merit, for the reasons we have already given.

Finally, Hendley claims that the plaintiff gave an improper pretrial interview. As Dominguez notes, and Hendley does not dispute, the defense did not seek a mistrial in the court below based on this interview—it merely sought to broaden voir dire. At voir dire, it was established that no member of the venire knew about the interview, and no seated juror even watched the news channel on which the interview aired. Thus, the defense was not prejudiced by this interview, and no error occurred as a result of allowing the trial to proceed.

Finding no errors among the issues raised by Hendley, we have no occasion to assess any cumulative effect.

* * *

We AFFIRM the judgment of the district court.