In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2862

SENECA ADAMS and TARI ADAMS,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06 C 4856 — **Charles R. Norgle**, *Judge*.

ARGUED APRIL 13, 2015 — DECIDED AUGUST 14, 2015

Before WOOD, *Chief Judge*, ROVNER, *Circuit Judge*, and
SPRINGMANN, *District Judge*.*

WOOD, *Chief Judge*. In 2004, Seneca and Tari Adams endured vicious beatings by Chicago police officers and prolonged detentions in the Cook County Jail. Along with their

---

*Hon. Theresa L. Springmann of the Northern District of Indiana, sitting by designation.

sister, Sicara Adams, they sued the City of Chicago and the officers for various violations of their rights under federal and state law. The City admitted its liability to all three plaintiffs for false arrest, excessive force, and race discrimination; it also stipulated that it was liable to Seneca and Tari for malicious prosecution in violation of state law. That left damages for the jury, which returned sizeable awards to each of the Adams siblings. The district court entered an order reducing each award, but it failed to give the plaintiffs the option of a new trial in lieu of accepting the lower amount. Seneca and Tari Adams (the Adams brothers) have appealed. We conclude that the purported remittitur must be vacated and the case returned to the district court for reinstatement of the jury's verdict in their favor.

**I**

Seneca, Tari, and Sicara Adams filed a complaint in federal court alleging various constitutional and state law violations against the City of Chicago and several Chicago police officers stemming from their arrests in 2004. They invoked federal-question jurisdiction for their claims under 42 U.S.C. §§ 1983 and 1985, see 28 U.S.C. § 1331, and supplemental jurisdiction for their state-law claims, see 28 U.S.C. § 1367.

As we noted, all three plaintiffs reached an agreement with the City on the question of liability and proceeded to trial before a jury on damages. The jury awarded $2.4 million to Seneca, $1 million to Tari, and $300,000 to Sicara. The district court announced that it was "remitting" those amounts to $1.17 million for Seneca, $350,000 for Tari, and $125,000 for Sicara; it did not give any of them the option of rejecting the reduction and having a new trial. Only the Adams brothers have appealed.

**II**

Before turning to the merits of the appeal, we explain why appellate jurisdiction is secure. A true remittitur order gives the winning party a choice: he may either accept a specific reduced monetary award or he may opt for a new trial. See *Dimick v. Schiedt*, 293 U.S. 474, 482–83 (1935). Ordinarily, a plaintiff who accepts a reduced award may not appeal from the court's decision to cut back on the jury's verdict. *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1977). If instead the plaintiff rejects the remittitur and chooses a new trial, then appeal is possible, but it must await the conclusion of the second trial. See 11 CHARLES ALAN WRIGHT *et al.*, FEDERAL PRACTICE & PROCEDURE § 2818 at 244 (3d ed. 2012). These rules, taken together, might make it seem as if appellate jurisdiction is lacking here. But our plaintiffs never agreed to the reduction in their award, and they were never offered the option of a new trial. Instead, the court simply took the jury's verdicts and slashed them. This was certainly an action that adversely affected the plaintiffs' legal rights, and thus they were entitled to bring an appeal to this court. See *Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 438 (7th Cir. 1992).

**III**

If this were an ordinary remittitur order, we would review it for abuse of discretion. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010). In this case, however, we face two questions: first, whether the form of the order was authorized; and second, whether the jury's verdicts should have been disturbed. The former is a legal issue for which *de novo* review is called for; the latter is a matter we review for abuse of discretion.

It is plain (and the parties agree) that the district court erred when it failed to offer the Adams siblings the option of a new trial. The harder question is what to do about that error. The Adams brothers argue that we should vacate the court's "remittitur" and order it to reinstate the jury verdict. Relying on the rule that a plaintiff may not appeal an order granting remittitur and offering a new trial, see *Seltzner v. RDK Corp.*, 756 F.2d 51, 52 (7th Cir. 1985); see also *Kelly v. Moore*, 376 F.3d 481, 483 (5th Cir. 2004), the City's opening gambit is that the appeal should be dismissed for want of appellate jurisdiction. We already have explained why we do not agree with that position. Otherwise, the City argues that the Adams brothers are asking us to allow them to skip the step of having to choose between a remitted verdict and a new trial. Such a ruling, the City contends, would put the brothers in a better position than they would have been in had the judge properly given them the choice of a new trial or a remittitur. It concludes that at most, we should vacate the district court's order and remand to give the Adams brothers the choice they should have had before, between a new trial and the lower amount of damages.

This is not the first time we have encountered the situation in which a trial judge failed to give a winning plaintiff the option of a new trial in lieu of a remittitur. The same thing happened in *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir. 1984). There we held that the failure to offer a new trial was error, because "[t]he Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury." *Id.* at 1392. We concluded that "[t]he proper corrective is to give [the plaintiff] the choice he was improperly denied, between accepting the remittitur and having a new trial on damages." *Id.* (citation omitted).

But there is a critical difference between *McKinnon* and the present case. In *McKinnon*, the plaintiff did not argue "that the judge abused his discretion in finding the damages excessive"; he contended only that "the judge violated proper procedure in failing to give [him] the option of a new trial in lieu of the remittitur." *Id.* at 1391. It therefore made sense that the solution to a procedural problem was a procedural fix. In our case, the Adams brothers have not confined themselves to the procedural point. They argue instead that the district judge committed two errors: first, that the judge's procedure was wrong; and second, that the judge abused his discretion in concluding that the damages were so excessive that a remittitur was proper. That puts Seneca and Tari Adams in precisely the position we contemplated in *Ash*, 957 F.2d at 438. There we reasoned that if "the court had chopped down [the plaintiff]'s verdict without permitting a new trial, [the plaintiff] would have had no choice to make and could have appealed straightaway." *Id.* Once we reach that point, the issue is straightforward: was it an abuse of discretion to reduce the verdicts?

In deciding whether a damages award is excessive, three factors guide our analysis: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011) (citation omitted).

A monstrously excessive verdict is one that is "a product of passion and prejudice." *Fleming v. Cnty. of Kane*, 898 F.2d 553, 561 (7th Cir. 1990) (quotation marks and citation omit-

ted). We have observed that the "monstrously excessive" standard and the "rational connection" standard are really just two ways of describing the same inquiry: whether the jury verdict was irrational. See *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713–14 (7th Cir. 2004); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 n.13 (7th Cir. 1995).

In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact. The issue before the jury, and thus the issue before the district court, is whether there was enough evidence to show that the awards of $2.4 million and $1 million were rationally related to both the physical and verbal harassment the police inflicted on Seneca and Tari, and their prolonged detention in the Cook County Jail. See *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006).

It is entirely possible that another jury might have evaluated the Adams brothers' damages more modestly, but that is not the standard. Upon reviewing the record, we find ample evidence to support the jury's verdicts. The jury heard testimony from Seneca Adams that, after lying on the ground in compliance with the police officer's command, one officer kicked him in the face. Thereafter, Seneca reported, the following sequence of events occurred: (1) he was pushed onto the hood of the squad car and punched in the face; (2) neighbors as well as his four-year-old niece Ciara witnessed the beating; and (3) when he asked the police not to beat him up in front of his niece, one officer responded, "I don't give a fuck about you or your nigger niece" and hit

him again in the face. The beatings were severe enough to cause Seneca to bleed all over his face and from his mouth. Seneca testified that, once forced into the squad car, he was punched in the face, grabbed by the hair, and thrown against the window, only to be driven around and repeatedly beaten up until the police took him to the hospital. There, after a CAT scan, he received nine stiches over his left eye and under his right eye. Seneca also testified that the officer who punched him was wearing weighted gloves. In the end, the beatings resulted in permanent scarring over his left eye and under his right eye. Seneca testified that during the beatings, the officers used racial slurs including "fuckin' monkey" and "fuckin' nigger." The jury also heard testimony about Seneca's 204-day detention in the Cook County Jail for crimes for which he was either initially found not guilty or which were later vacated and expunged.

Tari's treatment at the hands of Chicago police officers was not much better, again according to evidence the jury heard. Tari witnessed Seneca's beating on the hood of the squad car. After the police drove away with Seneca, Tari and Sicara got into Sicara's car to find their brother. They approached the police cars near the Cook County Jail at 26th and California, asked an officer what had happened to their brother, and were met with obscenities. An officer then reached into the car trying to shift the gear and in the process punched Tari. Tari drove off and stopped his car at a stoplight at 31st and California, only to have a police car ram the driver's side door with enough force to shatter glass and leave a hole in the door. As he climbed out of the other side of the car, the police tackled him, handcuffed him, and put him in the squad car for hours. As they had done with Seneca, the police drove Tari around, beating him up—including

in between hospital visits. Tari wound up at a different hospital, where medical staff ran a CAT scan and checked him for broken bones. The scan came back normal, and Tari received no further treatment. He did, however, sustain cuts inside his jaw, and his face, lips, and left eye were swollen. Tari was detained in Cook County Jail for 45 days.

Finally, the jury heard testimony from Sicara that when she saw Seneca the night of the incident, his face was "unrecognizable." She also saw Tari in a hospital gown with blood on it. Sicara testified that both brothers were fundamentally changed by the incident: Seneca went from being a "happy person" to someone who was "obsessed about what happened to him" and Tari was "not as trusting" or "as free-hearted as he used to be." Seneca himself testified that he had become paranoid. Both brothers said that they had moved to Arizona, in part because they did not feel safe in Chicago. Tari added that he still gets nervous around police.

In reviewing the jury's verdict, the district court should have kept in mind that liability was a given: the City conceded liability for *all* violations of *both* Seneca and Tari's rights under federal and state law. It is also telling that the jury's awards to the three siblings are internally consistent. It gave Seneca the most; Tari an intermediate amount; and Sicara (who has not even appealed) the least. This indicates that the jury saw that the physical harm suffered by the brothers varied, that the long-lasting emotional harm each sibling suffered was different, and that the periods of wrongful confinement in the Cook County Jail for the two brothers called for different awards.

One troubling feature of the court's rationale for reducing the verdicts was its apparent reliance on its own general

knowledge of the Cook County Jail. The district court seized on the fact that the Adams brothers' lawyer in his closing argument at trial made admittedly inappropriate remarks about the Cook County Jail, calling the inmates "animals" and that he wouldn't wish them "on anybody except the murderers, rapists, violent criminals who should be there." That isolated statement convinced the judge that the jury award could only have been the "product of the jury's fevered imaginings or personal vendetta." *Farfaras*, 433 F.3d at 566 (quoting *AIC Sec. Investigations, Ltd.*, 55 F.3d at 1285). But the record contained far more than counsel's overblown argument. We note as well that the court gave the jury the usual instruction warning it that arguments of counsel are not evidence—an instruction we routinely assume the jury follows.

The only question is whether counsel's statement was so inflammatory that it guaranteed there could be no connection between the evidence and the award given to the jury. The judge went to great lengths to point out that Seneca and Tari experienced little adversity in the jail, and that "convicted felons in Illinois serve their time in the Illinois Department of Corrections and not in the Cook County Jail." The latter point is inaccurate, if it was meant to describe every inmate in the Jail. IDOC prisoners are, in fact, routinely housed there. Whether or not Seneca and Tari were detained in the same part of the jail as the IDOC prisoners is not the point. The problem is that the judge substituted his own assumptions about the hardships of their wrongful detention for that of the jury. That was error. Viewed from the proper perspective, there was ample evidence to support the jury's damage awards, and counsel's closing argument, even if error, does not change that.

After reviewing the record, the court should have looked at past decisions to see if the awards were "out of line with other awards in similar cases." *Fleming*, 898 F.2d at 561 (citations omitted). This, however, is not as important as the review of the evidence in the case at hand; it offers at best a rough approximation of damage awards. The problem, well illustrated by the briefs in this case, is that one can always find excessive force cases with verdicts at different levels. This amounts to anecdotal evidence at best. Even that kind of evidence might show that it is hard to find a single case with damages as high as the one before the court (or as low, if the appeal is taken from an allegedly inadequate verdict), but caution should be the byword when looking at past awards.

That is especially so because in comparing past decisions to the jury award at issue, "an exact analogy is not necessary." *Farfaras*, 433 F.3d at 566. Rather, "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Id.* (citation and quotation marks omitted). To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur. There must be room for a jury's award to exceed the relevant range of cases when the facts warrant.

A comparison of the Adams brothers' verdicts and others does not suggest that they were outliers. A different judge from the same district court upheld a compensatory damages award greater than $2.4 million for excessive force. *Ibanez v. Velasco*, No. 96 C 5990, 2002 WL 731778, at *10 (N.D. Ill. Apr. 25, 2002). The City says that *Ibanez* is different, because

the plaintiff there (unlike the Adams brothers) had evidence of persistent medical issues and medical experts testified to the plaintiff's injuries. On the other hand, the claims in *Ibanez* were only for excessive force and failure to intervene to prevent excessive force, while here the theories included false arrest, excessive force, race discrimination, *and* malicious prosecution.

*Smith v. City of Oakland*, 538 F. Supp. 2d 1217 (N.D. Cal. 2008), also bolsters the Adams brothers' position. There, the judge remitted a verdict from $5 million to $3 million, but the plaintiff was detained in jail for four and a half months. *Id.* at 1241. Seneca was detained for nearly seven. Moreover, *Smith*'s award of $3 million neatly tracks Tari's award of $1 million for 46 days of detention plus excessive force, false arrest, and race discrimination. See also *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Cir. 1988) (upholding jury award of $801,000 (equivalent to $1.6 million in 2015 dollars) in compensatory and punitive damages for a plaintiff alleging false arrest, false imprisonment, intentional infliction of emotional distress, and malicious prosecution).

To be sure, there are cases where people suffered worse physical injuries and received smaller awards than the appellants here. See, *e.g.*, *Niehus v. Liberio*, 973 F.2d 526 (7th Cir. 1992). And there are also cases where plaintiffs received much larger awards for much longer periods of unlawful detention. See, *e.g.*, *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008). Nonetheless, we see nothing to undermine this jury's awards of $2.4 million and $1 million—amounts that lie well within the universe of excessive force and malicious prosecution verdicts.

## IV

Relying on some recent scholarship, the Adams brothers have also argued that the practice of remittitur violates the Seventh Amendment. See Suja A. Thomas, *Re-Examining the Constitutionality of Remittitur Under the Seventh Amendment*, 64 OHIO ST. L.J. 731, 747–50 (2003). In light of our conclusions with respect to the court's failure to offer the new-trial option and the impropriety of disturbing the jury's verdict, we have no reason to reach this point. We cannot resist observing, however, that it would be bold indeed for a court of appeals to come to such a conclusion, given what the Supreme Court has said on the topic. See, *e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 302 n.12 (1998) (Stevens, J., dissenting) (citation omitted) (noting that "[t]he lower courts are not powerless to control the size of damages verdicts" because they "retain the power to order a remittitur"); *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998); *Dimick, supra*; but see *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 280 n.25 (1989) (noting that the Court has "never held expressly that the Seventh Amendment allows appellate review of a district court's denial of a motion to set aside an award as excessive").

Although the court erred by failing to give the winning plaintiffs the option of a new trial, the remedy here is not a remand to re-run the remittitur procedure. We agree with the Adams brothers that the district court abused its discretion by modifying the jury's verdicts in their favor. We therefore VACATE the district court's judgments in their cases and REMAND with instructions to reinstate the jury's verdict.