In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2757

JADE V. GREEN,

*Plaintiff-Appellee,*

*v.*

JACK HOWSER and ANGELA HOWSER,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:16-cv-00863 — **Stephen C. Williams**, *Magistrate Judge.*

ARGUED SEPTEMBER 11, 2019 — DECIDED NOVEMBER 7, 2019

Before RIPPLE, ROVNER, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.* Tolstoy said that every unhappy family is unhappy in its own way, and that observation rings true here. When Jack and Angela Howser decided that Angela's estranged daughter, Jade Green, was failing to provide a suitable home for Jade's daughter, E.W., they enlisted the local police, the sheriff's office, the county prosecutor, and a private investigator to help them wrest custody of E.W. from Jade. Together, the group agreed that they would arrest Jade

while Jade's husband was out of the house so that the Howsers could take the child. So, after midnight one Sunday night, a caravan that included the sheriff, a sheriff's deputy, the Howsers, and the Howsers' private investigator set out for Jade's home to arrest her for writing Angela a $200 check that had bounced. Once Jade was in handcuffs, an officer gave Jack the all-clear to come inside. The sheriff did not allow Jade to designate a custodian for E.W. or obtain her consent to giving E.W. to the Howsers. Instead, over Jade's protests, the sheriff let Jack carry her daughter away.

Jade sued the Howsers under 42 U.S.C. § 1983 for conspiring with state officials to violate her due process right to make decisions regarding the care, custody, and control of her child. A jury returned a verdict in her favor, and the Howsers ask us to overturn it. They contend that there is insufficient evidence to support the verdict and that it is contaminated by an evidentiary error in any event. They also find fault with several aspects of the damages award. We reject all of the Howsers' arguments.

## I.

Before 2014, Jade Green lived with her four-year-old daughter, E.W., in a house owned by her mother, Angela Howser, and her mother's husband, Jack Howser. Jade also owed her job to the Howsers: she worked at a newspaper that they owned. By the time Jade married Josh Green in May 2014, however, her relationship with the Howsers had soured. In fact, to say that they had a falling out would be an understatement.

The Howsers made no bones about telling Jade that they thought Josh was bad news. Nor did they hesitate to inform

her that they had serious doubts about her fitness as a mother. Given their opinions, the Howsers were predictably upset when they learned that Jade planned to move with Josh and E.W. to a new home almost an hour away. The Howsers did more, however, than express disappointment or try to persuade Jade to stay. They blackmailed her with nude photos. If Jade took E.W., the Howsers threatened, they would publish the photos in their newspaper as well as mail them to Josh's workplace. They told her that Josh would want nothing to do with her after that. But if the nude photos weren't enough to drive him away, they warned Jade that they were willing to take another step. They would fire Jade from her job at the newspaper, and once she was unemployed, Josh would surely leave her.

When Jade moved with Josh and E.W. anyway, the Howsers followed through on their threat to fire her, accusing her of malfeasance. And since blackmail had been a failure, they changed strategies: they decided to go directly for E.W. They hired a private investigator—a friend and former state police officer—to help them find a way to take E.W. away from Jade and Josh. They quickly formed a plan. After the Howsers fired her, Jade closed a bank account from which she had written a $200 check to Angela. Knowing that the account was closed, Angela tried to cash the check anyway. When it bounced, the Howsers had the ammunition they needed.

Angela used the bounced check to file a complaint with the county prosecutor. The prosecutor then filed a felony information and obtained a warrant for Jade's arrest on the ground that she had passed a bad check. Once the warrant issued, the Howsers began calling local law enforcement officers to encourage them to execute it. The Howsers organized

a meeting at the courthouse with the county sheriff, the chief of police, and the Howsers' private investigator. At the meeting, the group decided that Jade's arrest would provide the perfect opportunity for the Howsers to take custody of E.W. If they arrested Jade, the police would have to place the child in the protective custody of someone else. And if the police arrested Jade when Josh was not at home, they could give E.W. to the Howsers. The group decided to execute the plan on the upcoming Sunday night, and they agreed to have someone drive by Josh's workplace before they made the arrest to make sure that he would be working when the police arrived.

On the night of the arrest, the Howsers and their private investigator met the police chief at his father's gun shop, as the four had planned to do. At first, everyone remained committed to the scheme. But when the group proceeded to the police station to meet the others, the police chief began to get cold feet. For starters, he couldn't find an active warrant for Jade's arrest in the department's system. Instead of being entered into the interagency database, which was protocol, this warrant had been faxed directly from the county prosecutor's office, which was unusual. On top of this, two of the department's officers expressed concern that the planned arrest might not be above board. They showed the police chief the Illinois statute governing child custody after an arrest; as the officers read the statute, it required either a parent's consent to the child's placement or placement into the custody of child services. They also told the police chief about the rift between the Howsers and the Greens. Neither wanted to be involved with the arrest because, as one put it, they "didn't want to break the law." After hearing that, the police chief backed out of executing the warrant.

Frustrated, Jack asked Angela to see if the sheriff would execute the warrant. Angela called the sheriff on his personal cell phone, and he agreed to come to the police station, where he met with the Howsers, their investigator, and the police chief. (Though the police chief had declined to execute the warrant himself, he continued to play a supporting role.) The group decided to stick with the plan to arrest Jade that night. During the discussion, the sheriff called the county prosecutor and put him on speakerphone. The prosecutor advised the sheriff and the police chief to move forward and told the sheriff that E.W. should be placed with the Howsers if no one but Jade was home. He justified the custody decision in part by telling the sheriff that there were multiple orders of protection against Josh, though the sheriff noted that there were no active orders in his office's system. The sheriff confirmed the prosecutor's directions with his dispatcher and told the group, "We're a go."

Shortly after midnight, the various law enforcement cars headed out in a caravan with the Howsers in the rear. In the squad car on the way to Jade's house, the sheriff asked his deputy if he was "okay with this." After equivocating, the deputy replied that if things went south with the arrest, he would just "throw the state's attorney under the bus."

When the caravan arrived at Jade's home, Jack and Angela stationed themselves around the corner, where they waited for a signal that Jack could come inside. The deputy knocked on the door, Jade answered, and the deputy advised her that there was a warrant for her arrest. After she was handcuffed, a member of the party signaled to Jack, who joined the group in Jade's kitchen. Jade became agitated when she saw Jack, calling him a "fucking asshole" and demanding that he get

away from her. Ignoring her protests, the officers allowed Jack to go upstairs, get E.W., and carry her off.

Jade, meanwhile, was taken to the police station for booking. Over an hour later, she posted bond and returned home with Josh. Distraught and frightened, Jade had no idea how to get E.W. back. She called the state police and the Department of Child and Family Services for help but was unable to obtain any information. The morning after her arrest, Jade tried to meet with the prosecutor at the county courthouse. But she was arrested again before she could make it there. In addition to filing a report regarding Jade's bad check, which occasioned the first arrest, Angela had filed a separate complaint alleging that Jade had refused to return the memory card from her company-issued cell phone. That gave the sheriff reason to take Jade into custody for misdemeanor theft, and Jade was again required to post bail.

Following Jade's second arrest, the Howsers obtained guardianship of E.W. and orders of protection keeping both Jade and Josh away from E.W. These orders were the opening salvo in a custody battle that extended for months. After lengthy legal proceedings and a third arrest of Jade at Angela's behest, Jade finally regained custody of E.W.

After the custody litigation concluded in Jade's favor, she sued the Howsers, the sheriff, and the county prosecutor under § 1983 for conspiring to violate her due process rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (holding that a private person who conspires with government actors to deprive a plaintiff of her constitutional rights acts "under color of law" for purposes of § 1983); *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) ("[A] private citizen can act under color of law if there is 'evidence of a *concerted effort* between a

state actor and that individual.'" (citation omitted)). Her theory was that the group executed a plan to place E.W. in the Howsers' custody in violation of the procedures dictated by Illinois law, thereby also violating her Fourteenth Amendment right to make decisions concerning the care, custody, and control of her child. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) (recognizing that the Fourteenth Amendment protects parental custody rights). The prosecutor and sheriff settled, but the suit against the Howsers proceeded to a jury trial over which a magistrate judge presided. At the end of the trial, the jury awarded Jade $470,000 in compensatory damages and $500,000 in punitive damages, for a total of $970,000. The magistrate judge denied both the Howsers' renewed motion for judgment as a matter of law and their motion for a new trial or remittitur of damages.

## II.

The Howsers raise three challenges on appeal. First, they argue that there was insufficient evidence to support the jury's verdict. Second, they challenge the magistrate judge's pretrial decision to exclude unfavorable information about Jade and Josh. And third, they argue that the damages awards were excessive.

## A.

A § 1983 conspiracy claim requires both (1) an underlying constitutional violation and (2) an agreement among the defendants to inflict the unconstitutional harm. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018). The Howsers do not challenge the magistrate judge's conclusion that violating the

applicable Illinois procedures constitutes a due process violation, so we express no view about whether the judge was right. We also express no view about what Illinois law requires, because the Howsers accept that it entitled Jade to designate the relative or responsible adult with whom she wanted the officers to place E.W. Instead, we deal only with the arguments that the Howsers do raise: (1) that no reasonable jury could have found that Jade objected to E.W.'s placement with the Howsers and (2) that no reasonable jury could have found that the Howsers had an agreement with law enforcement officials to take E.W.[1] In evaluating these arguments, we view the record in the light most favorable to Jade. *See Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018); *Naem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006).

We'll start with the Howsers' contention that no reasonable jury could have found that Jade objected to E.W.'s placement with them. The Howsers point out that Jade admitted at trial that she never specifically told the arresting officers that she did not want E.W. to be placed with Jack. In their view, that concession compels the conclusion that Jade implicitly agreed to the sheriff's placement of E.W. in Jack's custody. But

---

[1] Before the magistrate judge, the Howsers moved for both judgment as a matter of law and a new trial. A new trial can be granted where the jury's verdict, in the judge's own estimation, "is against the manifest weight of the evidence." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011). By contrast, judgment as a matter of law can only be granted when, even taking the evidence in the light most favorable to the nonmovant, "no reasonable jury" could have reached the verdict it did. *Id.* The Howsers invoke the "against the manifest weight of the evidence" standard in their brief, but they appeal only the denial of their renewed motion for judgment as a matter of law. Thus, the "no reasonable jury" standard is applicable.

seen in light of all the evidence, it does no such thing. The jury heard testimony that Jade referred to Jack as "that fucking asshole" after he entered her house to take E.W. and protested to the arresting officers that she did not want to be anywhere near him. It also heard that the sheriff told Jade that E.W. *had* to go into protective custody with Jack; that he presented Jade with no alternatives; and that Jade never gave affirmative consent for E.W. to be placed in Jack's custody. Based on this evidence, a jury could reasonably find not only that the sheriff barred Jade from designating a custodian for E.W. but also that Jade made her objections to Jack known.

The Howsers also insist that no reasonable jury could have found that they had an agreement with law enforcement officials to forcibly gain custody of E.W. They begin by complaining that Jade didn't demonstrate that the state officials stood to gain anything from the plan. But Jade didn't have to prove that there was something in it for the state actors. She had to show that "(1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Spiegel*, 916 F.3d at 616 (citation omitted). And she had plenty of evidence to establish that.

As the Howsers tell the tale, the jury knew nothing more than that they reported Jade to the authorities for bouncing a check and taking a memory card. The record, however, tells a different story. The jury heard testimony that the Howsers arranged numerous meetings with law enforcement, got officers to agree to execute the warrant when Jade's husband wouldn't be home, called the sheriff on his personal cell phone to ensure that the arrest and transfer of custody went

forward, rode in the law enforcement caravan on the night of the arrest, waited for an officer to signal that Jack could enter Jade's home, and took E.W. with the sheriff's approval. That is more than enough evidence to support the jury's finding that the Howsers conspired with law enforcement officials to take custody of E.W. over Jade's objection.

B.

Before trial, the magistrate judge granted Jade's motion to exclude any reference to her criminal history, any suggestion that she neglected E.W., any suggestion that Josh Green was dangerous, any evidence that either of the Greens ever injured E.W., and any evidence of the living conditions in the Greens' home. The Howsers wanted to introduce such evidence to give the jury an understanding of why they sought custody of E.W., but the judge noted that the evidence had little probative value on their liability because "[p]laintiff's bad behavior is not a defense to violating her rights." The evidence also carried a substantial risk of unfairly prejudicing the jury against Jade. *See* FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice."); *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) ("Unfair prejudice is 'an undue tendency to suggest decision on an improper basis, commonly … an emotional one.'" (citation omitted)). The magistrate judge acknowledged, though, that "some or all of this evidence could be permissibly used to impeach Plaintiff's testimony on the issue of damages" and that he would consider admitting it for that purpose if Jade opened the door. Either Jade never opened the door or the Howsers didn't try to impeach her with this evidence, because it never came in.

The Howsers maintain that the magistrate judge was wrong to exclude this evidence because without it, the jury lacked a full picture of why they thought that their actions were justified. And that's about all the Howsers say—their position is more of an assertion than an argument. They don't explain why the magistrate judge abused his discretion by excluding the evidence, much less why any error was prejudicial. *See Davies v. Benbenek*, 836 F.3d 887, 889–90 (7th Cir. 2016) (noting that evidentiary rulings are reviewed for abuse of discretion); *see also Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003) ("[E]ven where an error is demonstrated to exist, 'a jury verdict will stand if the trial court's evidentiary ruling was harmless error.'" (citation omitted)); *accord Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 439 (7th Cir. 2005) (noting that "an erroneous evidentiary ruling can be deemed harmless if the record indicates that the same judgment would have been rendered regardless of the error"). Having been given no reason to question this evidentiary ruling, we won't.

## C.

Finally, the Howsers contend that the damages award is excessive. The jury awarded Jade $970,000. That included $470,000 in compensatory damages (which was comprised of $120,000 in attorneys' fees and $350,000 for mental and emotional pain and loss of companionship) and $500,000 in punitive damages ($250,000 imposed on Jack and $250,000 imposed on Angela). The Howsers challenge each component of the damages award.

1.

We review the magistrate judge's refusal to remit compensatory damages for an abuse of discretion. *Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006). Two factors guide our analysis: whether the jury's verdict is rationally related to the evidence and "whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).[2]

We'll start with the $350,000 that the jury awarded Jade for mental and emotional pain and loss of companionship. The Howsers' argument that this amount is irrational boils down to this: Jade couldn't have been that upset because she didn't seek medical treatment and didn't try hard enough to contact E.W. during their period of separation. But the jury was free to reach a different conclusion about the toll that these events took on Jade. Over her objection, the county sheriff placed her daughter in the custody of people who had recently black-mailed her with nude photos, tried to break up her marriage, vindictively fired her from her job, and conspired with law enforcement officers to forcibly take her child. Jade was separated from her daughter and underwent the strain of a lengthy custody battle with people who had violated her

---

[2] We have sometimes characterized the test as including three factors: whether the award is monstrously excessive, whether there is any rational connection between the award and the evidence, and whether the amount is roughly comparable to awards in similar cases. *See, e.g.*, *Farfaras*, 433 F.3d at 567. We have repeatedly observed, however, that the "monstrously excessive" factor is simply another way of expressing the "rational connection" factor. *Adams*, 798 F.3d at 543. And because the former is amorphous, we have said that the latter is a better guide for the analysis. *G.G. v. Grindle*, 665 F.3d 795, 799 (7th Cir. 2011).

rights by taking E.W. in the first place. The award is rationally related to the evidence, and the Howsers don't try to argue that it is excessive compared to awards in similar cases.

The compensatory damages also included attorneys' fees from the custody litigation caused by the Howsers' actions. Jade testified that her attorneys' fees totaled $250,000; the jury valued them at $120,000. The Howsers' challenge to this amount is frankly hard to follow. Their jumbled description of the state-court custody litigation is nowhere close to a sufficient explanation of why the costs incurred were not rationally attributable to their actions. Nor did they introduce any other evidence that the fees were excessive—for example, evidence that Jade's counsel charged above-market rates. They have therefore given us no reason to second-guess the jury's valuation.

2.

In an action under § 1983, "a jury may be permitted to assess punitive damages … when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The Howsers do not contend that the magistrate judge abused his discretion by submitting the punitive damages issue to the jury. *Alexander v. City of Milwaukee*, 474 F.3d 437, 454 (7th Cir. 2007) ("This court reviews whether the issue of punitive damages was properly submitted to the jury for an abuse of discretion."). They do, however, protest the amount that the jury awarded. According to the Howsers, each of the $250,000 punitive damages awards is "grossly excessive" under the Due Process Clause. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 569 (1996).

While defendants have joint and several liability for compensatory damages, punitive damages are assessed separately against each defendant. *See Minex v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010); *Cooper v. Casey*, 97 F.3d 914, 920 (7th Cir. 1996). To ensure that a punitive damages award complies with the constitutional demand of fairness, we review it in light of "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Our review is de novo. *Rainey v. Taylor*, Nos. 16-4153 & 18-2990, 2019 WL 5257963 at *7 (7th Cir. Oct. 17, 2019). The Court has described the first prong as the most important. *BMW*, 517 U.S. at 575. Evaluating the reprehensibility of a defendant's conduct requires us to consider

> whether[] the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419.

These factors indicate that both Howsers engaged in reprehensible conduct. Their conspiracy with law enforcement officers to forcibly take E.W. was intentional, manipulative, and deceitful. And though they did not physically hurt Jade,

their behavior reflected total indifference to her mental and emotional health, not to mention her federally protected rights. They committed only one constitutional violation—conspiring to take E.W.—but it was hardly an isolated incident. It followed on the heels of their attempts to blackmail Jade, and they battled to keep their unlawfully obtained custody rather than thinking better of their behavior and trying to remedy it. We don't know anything about Jade's financial vulnerability—but the fact that she was unemployed suggests that she did not have the resources to foot the bill for the custody battle into which the Howsers dragged her. The Howsers' conduct was reprehensible enough to warrant a punitive sanction.

That brings us to the second prong, the disparity between the compensatory and punitive damages. The jury imposed a $250,000 award on Jack and a $250,000 award on Angela. The ratio between each of these awards and the compensatory damages award is approximately 0.5 to 1. That means that neither award is a candidate for remittitur based on disparity. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005) (refusing to question the constitutionality of a punitive damages award that was a fraction of the compensatory damages award). We have approved ratios as high as 37:1, as well has more modest but still larger ratios like 5:1 and 6:1. *Rainey*, 2019 WL 5257963, at *8 (discussing cases). The one-half ratio here reflects a punishment tailored to the offense rather than one that is grossly excessive relative to the State's interests in punishment and deterrence. *See BMW*, 517 U.S. at 568.

Finally, the third prong requires a comparative analysis to analogous punitive damages awards. But as with their challenge to compensatory damages, the Howsers fail to point us

to any comparable cases involving lower punitive awards. That failure deals the final blow to their appeal.

\* \* \*

The judgment is AFFIRMED.