In the

# United States Court of Appeals
## For the Seventh Circuit

—————————

Nos. 22-3202 & 23-1021

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

WAL-MART STORES EAST, L.P.,

*Defendant-Appellant/*
*Cross-Appellee.*

—————————

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 1:17-cv-00070-WCG — **William C. Griesbach**, *Judge.*

—————————

ARGUED SEPTEMBER 21, 2023 — DECIDED AUGUST 27, 2024

—————————

Before EASTERBROOK, ROVNER, and PRYOR, *Circuit Judges.*

ROVNER, *Circuit Judge.* These cross-appeals come to us following a jury trial on a failure-to-accommodate disability claim. Marlo Spaeth, an individual with Down syndrome, lost her job with Wal-Mart after the company changed its work-scheduling policies and Spaeth had difficulty in working the

new shift to which she was assigned. The Equal Employment Opportunity Commission filed suit on Spaeth's behalf under the Americans with Disabilities Act, alleging that Wal-Mart failed to accommodate Spaeth when it refused to reinstate Spaeth to her former work schedule. 42 U.S.C. §§ 12112(a), (b). A jury found in the EEOC's favor and awarded compensatory and punitive damages. The district court denied the EEOC's requests for injunctive relief. Wal-Mart now appeals the jury's adverse finding on liability along with the awards of compensatory and punitive damages. The EEOC cross-appeals the district judge's denial of injunctive relief. We affirm as to the jury's liability finding, the award of punitive damages, and the award of compensatory damages. But we vacate and remand for reconsideration as to the EEOC's requests for injunctive relief.

## I.

Because the EEOC prevailed on the question of liability, we recount the facts in the light most favorable to the jury's verdict. *E.g.*, *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 222 (7th Cir. 2021).

Spaeth worked as a sales associate at a Wal-Mart Supercenter store in Manitowoc, Wisconsin, for over 15 years. Spaeth was born with Down syndrome, which, in addition to presenting with distinct physical characteristics, results in developmental delays and lifelong intellectual disability. Typically, persons with Down syndrome have the intellectual capabilities of a person aged four to 11 years old. Among other limitations, Spaeth is unable to drive a car.

According to the plaintiff's expert, Dr. David Smith (a Down syndrome specialist), routine is especially important for someone with Down syndrome. "[I]f you take away that routine, that often causes a great deal of stress for them." R. 246 at 142. Spaeth's sister and current guardian, Amy Jo

Stevenson, testified that Spaeth "doesn't have the mental faculties to process change. So it's extremely difficult to change the habits and routines." R. 245 at 42. In the face of disruptions to her routines, Stevenson said, Spaeth "will shut down and try to ignore that we're trying to change something" (*id.*) or will "get[ ] frustrated, stress" and say that she is "too hot" (*id.* at 43). Stevenson added that because Spaeth typically seeks to avoid conflict, she might agree to do something that represented a departure from her routine but then fail to comply with the requested change. "She will tell me what she thinks I want to hear to appease me." *Id.* at 43; *see also id.* at 140 (Dr. Smith testified that individuals with Down syndrome do not like conflict and try to please others).

After Spaeth was hired by Wal-Mart in 1999, she was assigned to the domestics department, handling such tasks as folding towels, putting away rugs, and tidying items in the aisles. Wal-Mart managers uniformly testified that it was immediately obvious to them that Spaeth had Down syndrome. To supervise Spaeth, Wal-Mart selected department managers who were patient and would take the time to teach Spaeth how to do her job. It also limited the types of tasks assigned to her. For example, she was never asked to operate a cash register.

The Wal-Mart Supercenter in Manitowoc was open daily and employed some 250 to 300 associates during Spaeth's tenure. Spaeth was originally assigned to work a 12:00 p.m. to 4:00 p.m. shift and typically worked up to four days per week, excluding Thursdays and the weekend, when she was not available to work. This schedule was established based on Spaeth's inability to drive and her need to rely on public

transportation,[1] as well as her inability to stand for periods of time longer than four hours. Although Spaeth was able to ride the bus by herself, she caught the bus at the same time each day and had difficulty navigating a different bus schedule without help. On arriving home at 5 p.m., Spaeth would eat dinner and then watch the same television shows each night.

Store managers later confirmed that Spaeth had some difficulty in adapting to changes in her work routines. Store Personnel Coordinator Karen Becker recalled an occasion early in Spaeth's employment when department managers attempted to train Spaeth on a new task—folding bathroom rugs—and Spaeth misunderstood what was being asked of her. Spaeth's mother called Becker and reported that Spaeth thought she was being asked to clean store bathrooms. R. 245 at 137. During that same time period, Robin Castro was a Zone Merchandise Supervisor of the home lines department and worked with Spaeth directly for a period of one month. (By the time of Spaeth's discharge, Castro had become one of two store Co-Managers—one level below that of the store Manager.) Castro testified that she once asked Spaeth to dust coffee pot displays and that Spaeth initially refused; but on the third shift that Castro and Spaeth worked together, Spaeth complied with the request and continued to dust the displays thereafter without incident. R. 246 at 73. Bonnie Popp Ohlsen first worked with Spaeth in 2010, when Ohlsen was an Assistant Manager. (She was a store Co-Manager, along with Castro, at the time of Spaeth's discharge.) Ohlsen taught Spaeth how to handle returned store merchandise that needed reshelving. She testified that Spaeth at first resisted performing that new task, but over a period of two to four weeks, she

---

[1] Bus transportation was not available on Saturday afternoons and Sundays in Manitowoc, which is why Spaeth could not work on the weekends.

eventually adapted to the change. Ohlsen indicated that other changes to Spaeth's work routine involving new tasks required a similar period of adaptation. Ohlsen also recalled that Spaeth, a Green Bay Packers fan, took great offense to an adverse remark that Ohlsen had made in jest about the Packers: Spaeth thereafter avoided Ohlsen, and it was two weeks before Spaeth would speak to her again. R. 247 at 54–58.

Over the course of 15 years, Spaeth earned positive annual performance evaluations and steady raises. Every one of the 15 annual written evaluations issued prior to her discharge rated her as a solid performer who met the company's expectations (R. 245 at 108); a number of the evaluations rated her as exceeding expectations in particular areas. Her June 2003 annual review indicated that Spaeth "[is] [g]reat with customers, love[s] to zone her Department [i.e., fold the towels and otherwise straighten up the shelved items to make them look attractive], and is a very hard worker." That review identified returning damaged merchandise as an area in which Spaeth could improve. Trial Ex. 6 at 2, EEOC App. 180; R. 245 at 113. Spaeth's 2012 review noted that "Marlo is a pleasure to see every day," and that she "does a great job of zoning the towels and rug area. She is here when scheduled." The report identified retrieving and putting away returns in the domestics and housewares departments as an "area of opportunity" for Spaeth. Spaeth remarked to the evaluator that "I like my job. I like to help people." Trial Ex. 15 at 2, EEOC App. 182; R. 245 at 114–15. Her 2013 review reflected that

> Marlo has learned to get [her] own schedule without assistance. Marlo puts returns away on a daily basis and asks questions when she needs assistance. Marlo's areas of opportunity would be her customer interactions and learning surrounding areas to assist customers locating

> items. Marlo, you do a great job zoning espe-
> cially in the bath areas.

Spaeth again remarked to the evaluator that she liked her job. Trial Ex. 16 at 3, EEOC App. 185. Her 2014 review (the last prior to her 2015 discharge) noted:

> Marlo is very good with zoning the domestics and housewares area. Marlo is very good at put-ting away the returns for her areas as well. Marlo helps customers find the items they are searching for and promotes the ten-foot rule [encouraging associates to greet any customer who approaches within ten feet of the associate and ask if the customer needs help]. Marlo has zero absences within a six-month rolling period.

Trial Ex. 17; R. 245 at 116. In none of her reviews was Spaeth cited for attendance problems.[2]

---

[2] As Wal-Mart's attorneys pointed out at trial, there was a personnel discussion with Spaeth in February 2012 regarding her attendance. Spaeth had been absent without prior authorization on three days in January 2012, and she was counseled that she needed to show up for her scheduled shifts. Trial Ex. 1006, Wal-Mart App. 333; R. 246 at 250–51; R. 247 at 68–70. In addition, Wal-Mart noted that her time records from 2012 as well as 2013 reflect many instances in which she clocked out early (8 such occa-sions in 2012, and 16 in 2013). Wal-Mart Br. 7; Trial Exs. 1006, 1010, Wal-Mart App. 333–35; R. 246 at 250–51; R. 247 at 107–08. However, a review of those time records reveals that in many instances, although Spaeth clocked out of the store 10 or so minutes before the 4:00 p.m. end of her shift, she had clocked into the store 10 or so minutes early on those same occasions. R. 247 at 86–89. According to Ohlsen, Wal-Mart allowed asso-ciates to clock in and out within 10 minutes of their designated start and finish times. *Id.* at 86. So Spaeth was routinely working a full four-hour shift. Apart from the February 2012 discussion regarding her January 2012

Things changed in November 2014, when Wal-Mart's home office in Bentonville, Arkansas, issued a directive that managers were to cease making manual adjustments to computer-generated staff work schedules in the absence of a business justification for doing so. The computerized work schedules were intended to ensure that staffing met the needs of the store based on customer traffic patterns. Prior to this announcement, store managers had possessed the discretion to alter such schedules as they saw fit: indeed, managers at the Manitowoc store had exercised this discretion in Spaeth's case in order to maintain her regular noon to 4:00 p.m. work schedule. (That modified schedule had never presented a problem for the domestics department to which Spaeth was assigned so far as Personnel Coordinator Becker was aware. R. 245 at 129, 131–32.) Under the new regime, although it was still possible to manually alter a computer-generated work schedule, managers no longer had the discretion to make such changes unilaterally; any such adjustments were subject to "a strict approval process." R. 247 at 141. Moreover, if an employee's declared work availability (as disclosed on a form that employees were required to complete) did not match the scheduling generated by the computer system, he or she was given no hours at all. This very thing happened to Spaeth in the immediate aftermath of the policy change: Her work availability form (completed in 2006) indicated she was available only from 12:30 to 4:00 p.m.[3], and the computer did not schedule her for any shifts. When Spaeth complained, she

---

absences, there is no evidence indicating that store managers regarded this as a serious problem.

[3] It is not clear from the record why the form indicated that Spaeth's availability began at 12:30 p.m., when her longstanding shift had begun at noon.

was advised that she would now need to accept a 1:00 to 5:30 p.m. shift, which she did.

Spaeth had obvious difficulties in adapting to her new 1:00 to 5:30 p.m. schedule:

She would often leave an hour or more early, sometimes complaining to co-workers that she was feeling "hot," and she was absent without prior notice from some shifts altogether. Spaeth remarked to her sister, Stevenson, that the new hours reflected on her time slip were wrong because they were not noon to 4:00 p.m., as they had always been before. Stevenson testified that she telephoned Personnel Coordinator Becker and asked that Spaeth's schedule be switched back to the old noon to 4:00 p.m. schedule because Spaeth was "getting too hot, she wasn't able to eat, and she was missing her bus to get home." R. 245 at 45. Stevenson explained to Becker that "[b]ecause Marlo has Down syndrome she just couldn't handle working—she couldn't physically handle working that late" and "I asked her to have the hours changed back to noon to 4:00 to restore the order." *Id.* at 46.[4]

Although Stevenson thought that her phone call had taken care of the issue, Wal-Mart kept Spaeth on the new 1:00 to 5:30 p.m. schedule, and Spaeth continued to leave early and/or not show up, resulting in multiple attendance infractions. Wal-Mart began to pursue disciplinary procedures, including confronting Spaeth regarding the infractions. Assistant manager Julia Stern conducted "coaching" sessions with Spaeth in mid-December 2014 and again a month later. On both occasions, Spaeth expressed a desire to return to her old schedule

---

[4] Becker denied that such a telephone call had ever taken place, but of course the jury could have credited Stevenson's testimony over Becker's, and at this stage of the proceedings, we are obligated to view the record in the EEOC's favor. *Dean*, 18 F.4th at 222.

and voiced concerns about the new schedule, including worries about missing her bus or not eating her supper on time and getting sick as a result. (Indeed, in nearly every conversation with store managers regarding her new schedule, Spaeth would recite her work hours as 12:00 to 4:00 p.m.—her old schedule.) While Stern was talking to her during these sessions, Spaeth sat and stared with her head down, as if she might be crying. In February 2015, store Co-Manager Ohlsen completed a new work availability form on Spaeth's behalf, indicating that Spaeth was available to work from 12:00 noon to 6:00 p.m., and had Spaeth sign it. But Stern would later testify that each time she spoke with Spaeth about her attendance, Spaeth indicated that she wanted to work from noon to 4:00 p.m. like she used to do.

Store managers, in their trial testimony, indicated that they did not understand Spaeth's multiple requests to return to her prior noon to 4:00 p.m. work schedule to be a request for an accommodation to her disability. The new scheduling protocols evidently were not popular with employees and were the subject of many complaints and requests to revert to the prior scheduling regime. Managers perceived Spaeth's desire to return to her old schedule as being no different from the similar wishes of her co-workers. Consequently, they did not entertain the possibility of seeking authority from their superiors to restore Spaeth's former work schedule. And, apart from counseling Spaeth that she needed to adhere to the new work schedule, store personnel did not make efforts to help Spaeth adapt to the schedule change, as they had in prior instances when her work responsibilities were altered.[5] One incident stood out as an exception in this regard: Store

---

[5] Dr. Smith testified that with appropriate coaching from her supervisors, it was possible, although not certain, that Spaeth might have been able to adapt to the new work schedule over time. R. 246 at 169.

Training Coordinator Debbie Moss testified that on one occasion following the schedule change, she was clocking back into the store from her 4:00 p.m. lunch break and noticed Spaeth hovering near the time clock, although it was not yet 5:30 p.m. Spaeth remarked to Moss that she was tired and wanted to go home. Moss asked her, "Is it time?" and Spaeth acknowledged that it was not. Moss admonished Spaeth that her shift was not yet over and encouraged Spaeth to help her process store merchandise returns. Spaeth willingly did so, completing her shift in that instance without incident. R. 247 at 113–14. Otherwise, however, Spaeth continued to struggle with the new schedule.

On July 10, Wal-Mart discharged Spaeth based on her attendance infractions. By that time, Spaeth had accumulated some 17 "occurrences," with each occurrence representing multiple incomplete shifts. Spaeth broke down crying when Castro and Stern gave her the news. When she was escorted from the store, she said, "I don't understand." R. 247 at 121. When Moss explained to Spaeth that she was being let go because she was not complying with her new schedule, Spaeth remarked, "I know, I should have worked." *Id.* at 116.

Spaeth's sister, Stevenson, and her mother (then her legal guardian) subsequently met with several Wal-Mart managers to discuss Spaeth's termination. Stevenson expressly invoked Spaeth's right to accommodation under the ADA and asked that Spaeth be given her job back and restored to her old work schedule. The managers in attendance understood that Spaeth's family members were asserting that Spaeth should have been given a schedule accommodation but was not, in violation of the ADA; they also interpreted Stevenson's remarks as a threat that the family intended to file suit against Wal-Mart if Spaeth was not reinstated and given her old schedule back. Following this meeting, regional "People Director" (i.e., human resources manager) Lee Spude instructed

Wal-Mart personnel to cease communications with Spaeth's family.

Store Manager Kent Abitz conducted what Wal-Mart referred to as a "red book" inquiry into the allegations of disability discrimination, focusing on whether Spaeth had violated Wal-Mart's attendance policy. He did not interview Spaeth or her sister, nor did he discuss a potential schedule accommodation with store managers. He recommended upholding her discharge. Spude in turn agreed with Abitz's recommendation. Spude would later testify at his deposition that although a scheduling accommodation was considered as a possibility in the course of the company's inquiry, it was never explored in any detail because the investigation sustained Spaeth's discharge and, as a result, she was no longer the company's employee. At trial, however, Spude said that he did not consider Stevenson's remarks at the post-discharge meeting to have been a request for an accommodation (R. 247 at 233), although Spude agreed that Spaeth's family had put her ADA rights "into question" at that meeting (*id.* at 218). Denise Morgan, an Ethics Manager at Wal-Mart's national headquarters, also sustained the termination, and in fact determined that Wal-Mart had been too lenient in its handling of Spaeth's attendance infractions. Trial Ex. 32 at 5, EEOC App. 235. (Whereas Spaeth had accumulated 17 occurrences by the time she was discharged, the usual threshold for termination was seven.) Morgan advised the store managers involved to be more strict in enforcing the company's attendance policy. *Id.* Having concluded that Spaeth was properly discharged based on her attendance infractions and not based on any animus related to her status as a person with a disability, the company declined to reinstate Spaeth, although it left open the possibility that Spaeth could reapply for a job at Wal-Mart at any point in the future.

As noted, the EEOC brought suit under the ADA challenging Wal-Mart's failure to accommodate Spaeth's disability by not modifying her work schedule, and after a four-day trial, the jury found in the EEOC's favor. At trial, managers at the Manitowoc store who had worked with Spaeth testified that they did not understand Spaeth's difficulties in adapting to the new 1:00 to 5:30 p.m. work schedule to be connected to her disability, or that her requests to return to her noon to 4:00 p.m. schedule amounted to a request for an accommodation of her disability. The lone exception in this regard was store Co-Manager Robin Castro. Although in the run-up to Spaeth's discharge, Castro did not understand Spaeth to be asking for an accommodation to her disability, in retrospect, she agreed that the requests by Spaeth and her sister to restore her original work hours in fact did constitute a request for a work schedule accommodation which, according to Wal-Mart's policies, could be made orally or in writing, by the employee or through a family member or friend, and did not need to include any specific words. Per Wal-Mart's protocols, such an accommodation request should have been forwarded to human resources personnel, who in turn would submit the request to Wal-Mart's national disability accommodations services center. Yet, as the trial testimony made clear, no one at the Manitowoc store had taken any steps to initiate consideration of a possible schedule accommodation for Spaeth: no one printed the requisite accommodation request form for her (or a family member); and no one passed along her request for a schedule change to the appropriate personnel. Wal-Mart witnesses also took the position, *inter alia*, that the company's policies did not permit long-term schedule modifications and that the company did not grant such accommodations in practice. Again, Castro stood out as the lone exception in this regard: she believed, in retrospect, that Spaeth should have been granted a schedule modification as an accommodation to her disability. R. 246 at 58–59.

The jury's special verdict included findings that (1) Wal-Mart was aware that Spaeth needed an accommodation due to her disability; (2) Wal-Mart could have accommodated her without undue hardship; and (3) Wal-Mart failed to provide Spaeth with a reasonable accommodation, discharged her, and declined to reinstate her, all in violation of the ADA. R. 248 at 118–19; R. 236. The jury awarded her $150,000 in compensatory damages and $125 million in punitive damages. R. 248 at 119–20; R. 236. The district court reduced the punitive damages to $150,000 in order to bring the total award in line with the ADA's damages cap of $300,000 for large employers. R. 248 at 123; *see* 42 U.S.C. § 1981a(b)(3)(D). The court additionally awarded equitable relief in the form of $44,757.80 in backpay, $5,978.63 in prejudgment interest, and $68,926.16 for tax consequences, for a total monetary award of $419,662.59. R. 266 at 8–12; R. 273, 274.

The EEOC filed a motion asking that the court order Spaeth reinstated to her position with Wal-Mart and also requesting a variety of other injunctive measures bearing on Wal-Mart's disability-related policies and practices. R. 251, 252. The district court agreed to order Spaeth reinstated and also to order that Wal-Mart contact Spaeth's guardian regarding any future coaching, disciplinary, or accommodation issues. R. 266 at 7–8. (Spaeth subsequently declined to return to Wal-Mart.) But the court declined to order the additional forms of injunctive relief that the EEOC requested, which in general terms were aimed at preventing a recurrence of what had happened to Spaeth. The court indicated that the sorts of injunctive relief the EEOC was seeking were for the most part directives that Wal-Mart obey the law (R. 266 at 4–5), a form of relief that is appropriate only where the evidence suggests that the employer's illegal conduct may persist and that "must be evaluated with great care" when sought. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 842 (7th Cir. 2013). In the district

court's view, the evidence did not show that Wal-Mart was likely to repeat its illegal conduct in the future; it was satisfied that the firm's existing policies and training were sufficient to head off such conduct. R. 266 at 4–7, 8.

For its part, Wal-Mart filed a post-trial motion arguing that (1) the evidence was insufficient to support a finding that Wal-Mart knew that Spaeth's difficulty adjusting to her new work schedule was linked to her Down syndrome; (2) the evidence did not support an award of punitive damages; and (3) the $150,000 award of compensatory damages should be remitted to $15,000. R. 277, 278. The district court rejected each of these arguments. First, as to Wal-Mart's knowledge of a link between Spaeth's disability and her difficulty working the new schedule, the court noted testimony indicating that Wal-Mart's managers were aware that Spaeth needed extra support when changes were made to her routine. Prior to Spaeth's termination, Stevenson had informed store Personnel Coordinator Becker that Spaeth could not handle the new work schedule due to her Down syndrome, and after the termination, Stevenson had met with Spaeth's managers and asked that Spaeth be reinstated and granted a schedule accommodation under the ADA due to her Down syndrome. Thus, the jury could reasonably have found that Wal-Mart knew of the connection between Spaeth's disability and her need to stay with her original work schedule. R. 283 at 4–5. Second, as to punitive damages, the court reasoned that the jury was entitled to discredit Wal-Mart's position that it had simply misunderstood its obligations under the ADA and had genuinely wanted to help Spaeth. Rather, the jury reasonably could have found that Wal-Mart, knowing that Spaeth's attendance problems were related to her disability, nonetheless declined to entertain her request for a schedule accommodation, in reckless disregard of her rights under the statute. *Id.* at 5–6. Third, the court deemed the evidence sufficient to

support the award of compensatory damages, noting that Spaeth experienced distress and confusion when she was terminated, exhibited symptoms of memory loss, and was diagnosed with depression for which medication was prescribed. The court did not agree that the $150,000 award grossly exceeded those in comparable cases and thus rejected Wal-Mart's request for a remittitur. *Id.* at 7–8.

## II.

1. *Evidence of a link between Spaeth's disability and her inability to adapt to the new work schedule.*

Wal-Mart repeats the argument it made unsuccessfully to the district court that the EEOC failed to prove that the company was aware that Spaeth's inability to adapt to the new work schedule, along with her request that Wal-Mart reinstate her original noon to 4:00 p.m. schedule, were linked to her disability, such that it should have treated the request as one for a reasonable accommodation under the ADA. *See* 42 U.S.C. § 12112(b)(5)(A) (employer violates the ADA if it fails to make "reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability") (emphasis added). The briefs discuss two paths by which the jury could have found that Wal-Mart had the requisite awareness on this point: (1) that Spaeth or her representatives made the company aware of a medically necessary accommodation, or (2) Spaeth's need for an accommodation was obvious. We view these as being two sides of the same inquiry: does the evidence support the jury's finding that Wal-Mart was made aware of the link between Spaeth's disability and her inability to comply with the new work schedule? Viewing the evidence favorably to the EEOC, the answer is yes.

First, there is no dispute that Wal-Mart knew Spaeth had a disability: the fact that Spaeth had Down syndrome was obvious to Wal-Mart managers, as they acknowledged at trial.

Second, store managers knew from past experience that Spaeth had difficulty coping with changes to her routine: for example, she had previously found it difficult when new tasks were added to her job responsibilities. Managers knew that Spaeth required extra time, attention, and patience when she was asked to modify her work routines.

Third, in November 2014, when Spaeth's schedule was changed from a noon to 4:00 p.m. shift to a 1:00 to 5:30 p.m. shift, Spaeth exhibited immediate and obvious difficulties in complying with the new schedule. After 15 years of reliable work attendance, Spaeth was suddenly clocking out hours early, expressing fears that she would miss her bus or her dinner, and on multiple occasions was absent altogether without notice. When admonished about not working her new schedule, Spaeth repeatedly expressed confusion, insisting that her schedule was 12:00 to 4:00 p.m. and asking that she be restored to that schedule. A reasonably astute manager, having in mind the prior challenges Spaeth had experienced in handling new duties, however straightforward they were, might have considered whether her inability to adapt to the new schedule could be due to her Down syndrome. *See* 29 C.F.R. Pt. 1630 app., § 1630.9 ("If an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation."); *Bultemeyer v. Ft. Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("[P]roperly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation,' particularly when the employee has a mental illness. The employer has to meet the employee half-way, and if it appears that the

employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

The jury also could have found that any doubts on this score were resolved when Stevenson, both before and after Spaeth's discharge, expressly advised Wal-Mart managers that Spaeth could not adapt to the new schedule because of her Down syndrome.[6] And of course, following the discharge, Stevenson expressly invoked Spaeth's rights under the ADA and asserted that the company had failed to reasonably accommodate Spaeth's disability by refusing to reinstate her original work schedule. *See id.* at 1286 (noting that when employer received doctor's note shortly after it discharged plaintiff, it could have used the opportunity to reconsider the termination decision and to involve plaintiff and his physician in the discussion).

Wal-Mart insists that these discussions were not sufficient to place it on notice that a schedule accommodation was medically necessary, because Wal-Mart was never given a doctor's note or other medical evidence supporting Stevenson's assertions. But here the key point is that Wal-Mart never asked. In view of the evidence we just discussed, the jury could have found that Spaeth and Stevenson had requested a schedule accommodation to Spaeth's disability. At that point, Wal-Mart would have been within its rights to ask for medical evidence backing up the notion that Spaeth required an accommodation because her Down syndrome rendered her unable

---

[6] Wal-Mart points out that Stevenson did not articulate the particular theory that the EEOC presented at trial, that individuals with Down syndrome have difficulty adapting to changes in their routine. But the important point is that Stevenson did alert Wal-Mart to the connection between Spaeth's disability and her difficulty complying with the new work schedule.

to adapt to the new work schedule. But things never progressed that far: Wal-Mart dismissed Spaeth's requests out of hand. True enough, this court did say in *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009), "that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonableness standard to provide a specific modest accommodation the employee requests." Thus, if any of Wal-Mart's managers had asked Stevenson to supply such evidence and none was forthcoming, Wal-Mart might have a point.

But Wal-Mart is essentially suggesting that it had no duty to consider the possibility of an accommodation, and no duty to engage in the interactive process on accommodations that the ADA case law envisions, unless and until the employee, without being asked, came forward with the requisite medical documentation. This notion is inconsistent with the interactive nature of the accommodation process itself. We have pointed out in multiple cases that when clarification is needed as to the nature of an employee's disability or the particular accommodation required, it is the employer's responsibility to solicit that information from the employee. *See Rowlands v. UPS – Ft. Wayne*, 901 F.3d 792, 801 (7th Cir. 2018); *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786–87 (7th Cir. 2016) (per curiam); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803–04 (7th Cir. 2005); *Bultemeyer*, 100 F.3d at 1285–86; *see also Malas v. Hinsdale Twp. Dist. #86*, No. 15-cv-10490, 2019 WL 2743590, at * 21 (N.D. Ill. July 1, 2019) (employer "could not simply ignore Plaintiff's request for an accommodation until Plaintiff figured out that Defendant required medical documentation"). Wal-Mart knew better than anyone else what information it would need to evaluate Spaeth's request for a

schedule accommodation; neither Spaeth nor her family members could be expected to read the company's mind. *See Bultemeyer*, 100 F.3d at 1285. If Wal-Mart needed information from Spaeth's physician supporting the requested accommodation, it was obligated to ask for it. Indeed, that is what its own accommodation policy for Wisconsin employees stated: "When you request an accommodation, *we may request* that you provide medical documentation regarding your condition in order to assist us in evaluating your request. *When requested*, you must provide medical documentation from a health care professional … ." Trial Ex. 1061, Wal-Mart Supp. App. 84 (emphasis added).

There is ample evidence in the record that Wal-Mart was on notice that a schedule accommodation for Spaeth was medically necessary, particularly once Stevenson intervened on Spaeth's behalf to advise Wal-Mart's managers that Spaeth's Down syndrome made it extremely difficult for Spaeth to adapt to her new work schedule. At that point, Wal-Mart had a duty to seek out from Spaeth and her family members whatever medical documentation it needed to corroborate the medical need for an accommodation and to explore what type of accommodation would be suitable.

2. *Sufficiency of evidence as to punitive damages.*

Punitive damages are warranted when an employer acts "in the face of a perceived risk" that its conduct violates federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). Malice is not necessarily required; reckless indifference will suffice. 42 U.S.C. § 1981a(b)(1); *Kolstad*, 527 U.S. at 535–36; *EEOC v. Flambeau, Inc.*, 846 F.3d 941, 947 (7th Cir. 2017).

Wal-Mart repeats the argument that it did not know that Spaeth's disability was the reason for her inability to adapt to the new work schedule and that she needed an

accommodation—Wal-Mart insists that it simply committed an honest mistake.

But for all of the reasons discussed above, there was ample evidence supporting the jury's finding that Wal-Mart had notice of the link between Spaeth's disability and her trouble with the new schedule, particularly once her sister intervened and told Wal-Mart's managers precisely this. Yet even after Spaeth's mother and sister met with Wal-Mart managers following Spaeth's discharge and invoked her right to a schedule accommodation under the ADA, Wal-Mart still did nothing to address the possibility of an accommodation: it did not consider whether, given what it was hearing from Spaeth's family members, Spaeth's disability may have contributed to her failure to show up for work and to her pattern of leaving work early; it did not reconsider its rationale for discharging Spaeth in light of this information; it did not ask Spaeth's family for corroboration from a physician, if that is what it needed; and it did not meaningfully consider whether it would have been feasible to grant Spaeth the scheduling accommodation she and her family members had requested. Instead, Wal-Mart limited its post-discharge investigation to the question of whether Spaeth in fact was guilty of multiple attendance infractions despite warnings and, once it answered that question in the affirmative, deemed the discharge decision valid and considered the matter closed. Finally, as the district court noted, it is telling that, at Spude's direction, Wal-Mart personnel cut off communications with Spaeth's family after the post-discharge meeting despite Stevenson's invocation of the ADA and Spaeth's right to an accommodation at that meeting. The jury reasonably could have found that Wal-Mart's course of action was wholly contrary to the interactive process that the ADA jurisprudence calls for.

All of this is consistent with Wal-Mart being recklessly indifferent to Spaeth's statutory rights as an individual with a

disability. The company no doubt was an excellent employer to Spaeth in other respects, but the jury reasonably could have found that Wal-Mart abdicated its responsibilities under the ADA in failing to assess whether Spaeth's attendance problems were due to her disability and whether a schedule accommodation would have been feasible. Indeed, the fact that Morgan, Wal-Mart's national ethics manager, indicated that the managers at Wal-Mart's Manitowoc store had been too lenient with Spaeth's attendance infractions could have been construed as reflecting a callous indifference to Spaeth's situation. The jury had ample reason to award Spaeth punitive damages. (And the reduced amount of $150,000, in compliance with the ADA damages cap, was of course reasonable.)

3.   *Whether the compensatory damage award of $150,000 should have been reduced.*

Wal-Mart argues that the district court should have remitted the compensatory damage award by 90 percent to $15,000 because, in its view, the evidence was insufficient to support more than a minimal award. We review the district court's decision not to remit the award for abuse of discretion. *E.g.,* *Green v. Howser*, 942 F.3d 772, 773 (7th Cir. 2019). "Two factors guide our analysis: whether the jury's verdict is rationally related to the evidence and 'whether the award is roughly comparable to awards made in similar cases.'" *Id.* (quoting *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015)) (footnote omitted).

It is undisputed that Spaeth was greatly distressed at Wal-Mart's decision to discharge her. Spaeth was proud of her work at Wal-Mart, R. 245 at 39, and the portion of her annual reviews reserved for her own comments indicated that she liked her job and enjoyed helping people. *E.g.,* R. 245 at 115, 116. Spaeth told the jury that she was "upset" when Wal-Mart fired her, that she missed her job and "all the people," and that she feels sad when she sees a Wal-Mart truck. R. 246 at

119, 120, 122. Dr. Smith testified, "This was her life. She had done it for 15 years. And that was taken away." R. 246 at 153. No doubt most discharged employees are dismayed by their employer's decision to let them go, but of course Spaeth, given her disability, had a limited ability to put into perspective the company's decision to terminate her. "Why me?" she asked her sister. "Why did they do this to me? Why me?" R. 245 at 57; *id.* at 48. The jury might have found that Spaeth's disability magnified her emotional injury. Stevenson's testimony (as well as that of Spaeth's roommate, Barbara Barnes) established that Spaeth's distress continued in the days immediately after the discharge, and that her sadness persisted for years. When Dr. Smith interviewed Spaeth in 2017, more than two years after her discharge, she remarked that "every day is a bad day." R. 246 at 146. Smith noted that Spaeth had lost her sense of purpose, and that the loss of her job had resulted in a decline in Spaeth's social skills. R. 245 at 60. He diagnosed Spaeth with depression (in addition to memory loss) and prescribed the anti-depressant medication that Spaeth was still taking at the time of trial.[7] To be sure, the testimony of these witnesses was not expansive, but it included both first- and third-person confirmation, including a physician's opinion, as to the adverse emotional and physical effects of Wal-Mart's decision to discharge Spaeth. *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 390 (7th Cir. 2011) (noting we have sustained substantial compensatory-damage awards when they are supported by "first- and third-person testimony regarding ongoing emotional and physical effects of the discrimination suffered by the plaintiffs"). The jury was entitled to credit this

---

[7] Smith testified that, in his experience, depression among those with Down syndrome who have lost their jobs is common. R. 246 at 153.

testimony, which amounts to a sufficient basis for the compensatory damage award.

Wal-Mart argues that the damages should be reduced because Spaeth's mother died not long after she was discharged and Spaeth's depression just as likely stemmed from her mother's passing as from her termination. But the likelihood that her mother's death may have contributed to Spaeth's depression does not somehow weaken the evidentiary basis for the award. Emotional injuries may often have multiple causes, but the jury was entitled to infer that Wal-Mart's decision to discharge Spaeth was a major cause, if not the primary cause, of her depression. The testimony that, for years, Spaeth covered her face whenever she saw a Wal-Mart commercial tends to confirm that very point. The award of compensatory damages was rationally related to the evidence.

The award was also roughly comparable to compensatory-damage awards in other cases. This is not a case like *Marion Cnty. Coroner's Office v. EEOC*, 612 F.3d 924, 931 (7th Cir. 2010) (racially-motivated discharge of county official in violation of 42 U.S.C. § 2000e-16c), where we ordered a remittitur of a $200,000 award in view of the fact that the award rested entirely on the plaintiff's own extremely brief testimony. Again, in this case, multiple witnesses, including a medical doctor, established that Spaeth experienced significant and lasting emotional distress and depression as the result of the loss of her job. Comparable cases have resulted in similar if not greater awards. *See*, *e.g.*, *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1008–09 (7th Cir. 2020) (upholding statutory-maximum award of $300,000 in Title VII and § 1983 national-origin discrimination case); *Farfaras v. Citizens Bank & Trust Co. of Chicago*, 433 F.3d 558, 566–67 (7th Cir. 2006) (upholding award of $200,000 in Title VII sexual harassment case); *Deloughery v. City of Chicago*, 422 F.3d 611, 620–21 (7th Cir. 2005) (upholding remitted award of $175,000

in Title VII and First Amendment retaliation case).

4. *Injunctive relief.*

The EEOC cross-appeals the denial of most of the injunctive relief it requested. As noted above, although the district court agreed to order Spaeth's reinstatement and to require that Wal-Mart take certain steps on the assumption that Spaeth would accept reinstatement (which she ultimately did not), the court denied the EEOC's requests for other injunctive relief related to accommodation requests generally. We review a district court's denial of injunctive relief for abuse of discretion, its factual determinations for clear error, and its legal conclusions de novo, and we give deference to the court's balancing of equitable factors. *EEOC v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 661 (7th Cir. 2022).

Under the ADA, once a "court finds that the [employer] has intentionally engaged in … an unlawful employment practice," the court "*may* enjoin the [employer] from engaging in such unlawful employment practice" and order "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1) (Title VII) (emphasis added); *see id.* § 12117(a) (making remedies set forth in § 2000e-5 available in ADA cases). As the statute's use of the word "may" indicates, this is a discretionary call on the district court's part. Proof that the employer had previously engaged in widespread discrimination or has engaged in any documented discrimination beyond the case at hand is not a prerequisite to injunctive relief addressing the type of discrimination that the plaintiff has proven. *AutoZone*, 707 F.3d at 840. This court has noted that such relief is warranted if it appears that "the employer's discriminatory conduct could possibly persist in the future." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001) (citation omitted). Once a plaintiff has shown that the employer engaged in intentional discrimination in the instant

case, it becomes the employer's burden to "prove that the discrimination is unlikely to continue" or that "the claimant's case is somehow different from the norm." *AutoZone*, 707 F.3d at 840.

Apart from the specific injunctive relief the EEOC sought with respect to Spaeth (which became moot once she ruled out the prospect of returning to Wal-Mart), the EEOC sought additional injunctive relief, some applicable to Wal-Mart as a whole and some applicable only to Wal-Mart's Region 53 (comprising 114 stores, including the Manitowoc store, and some 30,000 employees). The EEOC proposed that these requested measures be imposed for a period of five years. With respect to Wal-Mart as a whole, the EEOC sought two related injunctive provisions, one prohibiting Wal-Mart from denying reasonable accommodations to disabled employees (in the absence of undue hardship) on the ground that the requested accommodations are indefinite, long-term, or permanent, and the second requiring Wal-Mart to modify its accommodation polices to clarify that these types of accommodations are, in fact, available to disabled employees. As to Region 53, the EEOC sought a suite of injunctive relief—narrow in certain instances (requiring notice to employees of the verdict in Spaeth's favor and advising them of their right to contact the EEOC without fear of retaliation) but more expansive in others (for example, requiring that Region 53 notify the EEOC of any requests for accommodation and to document the steps it had taken in response to such a request, provide training to its managers as to work-schedule accommodations under the ADA, and document and evaluate the company's adherence to its equal employment opportunity polices during the annual review process for certain managerial employees).

The district court denied the EEOC's "broad requests for relief" in the first instance because they were "for the most part, directives that Wal-Mart obey the law" and to that extent

were "inappropriate." R. 266 at 4. The assertion that the EEOC was asking for an "obey the law" injunction was certainly true in at least one instance—the EEOC asked that Wal-Mart be enjoined from denying reasonable accommodations to employees with disabilities in Region 53—and arguably it was also true of a more focused variant of that relief—the request that Wal-Mart as a whole be enjoined from denying a reasonable accommodation on the ground that the accommodation at issue is indefinite, long-term, or permanent. But it was incorrect to write off all seven of the injunctions requested by the EEOC as "obey the law" injunctions, particularly where some of them (including the provisions requiring that the company notify employees of the verdict and train its supervisors and managers regarding the propriety of schedule accommodations) relate specifically to the type of misconduct that Wal-Mart committed in this case and are aimed at preventing a recurrence.

The district court also reasoned that "the relief requested is redundant to Wal-Mart's existing policies." R. 266 at 5. That may be true in the main: Wal-Mart does have comprehensive non-discrimination policies that include provisions addressing disability accommodations. But as the EEOC's briefs point out, Spaeth's case illuminated at least two shortcomings in the way Wal-Mart managers handled her request for reinstatement of her original work schedule: (1) store personnel utterly failed to treat the request as a request for an accommodation and initiate the constructive, give-and-take process that the ADA, the case law, *and* Wal-Mart's own policies require, even after Stevenson alerted store managers to the connection between Spaeth's disability and her difficulties in complying with her new work schedule; and (2) Wal-Mart managers were evidently under the impression that long-term schedule modifications could not be granted to an employee, which arguably was consistent with the company-wide directive that

was issued to managers in 2014 that the computer-generated schedules not be modified except for business reasons. And many of these managers are still working for Wal-Mart. This reveals a second oversight in the district court's analysis: it did not take into account the totality of the trial evidence bearing on why Spaeth was denied an accommodation in her work schedule. Some of the circumstances in this case were unique to Spaeth, including the difficulties she had complying with the new work schedule as a result of her Down syndrome. But others—including the company's unwillingness to entertain the possibility of a long-term schedule accommodation—were not. Although Wal-Mart now concedes that its disability policies allow for long-term schedule accommodations, the contrary position that Wal-Mart witnesses took at trial certainly presents the possibility that other employees might be denied such an accommodation if sought.

We accept the district court's additional observation that the trial evidence did not disclose any animus or ill will on Wal-Mart's part toward Spaeth individually or more generally toward employees with intellectual disabilities. R. 266 at 6. *See Wal-Mart*, 38 F.4th at 661–62 (although discriminatory animus is not a prerequisite to injunctive relief, it may be considered as a factor bearing on the propriety of such relief). But the shortcomings in its response to Spaeth's request for a schedule accommodation raise the possibility that this may have been more than an isolated incident. Wal-Mart is a national employer with over one million workers on its payroll. It seems unlikely that Spaeth would be the first or the last employee with a disability who might need a work-schedule accommodation but who might also have difficulty invoking her rights under the ADA.

Intentional discrimination against Spaeth was established in this case, and as a result it was Wal-Mart's burden to establish that its discriminatory conduct is unlikely to recur, rather

than the EEOC's burden to show the opposite. *AutoZone*, 707 F.3d at 840. The district court acknowledged the burden but, in the course of explaining why it believed the proposed injunctive measures duplicated Wal-Mart's existing policies, the court also remarked that "the EEOC has not shown that 'the proven illegal contact may be resumed.'" R. 266 at 5 (quoting *AutoZone*, 707 F.3d at 842). Because we think it appropriate for the district court to take a second look at the forms of injunctive relief requested by the EEOC, the court can take the opportunity on remand to reconsider whether Wal-Mart has carried its burden on this point.

For all of these reasons, we will vacate and remand the judgment as to the EEOC's requests for injunctive relief and remand for reconsideration. We do so recognizing that whether to grant relief is a discretionary call on the district judge's part. If what concerns the district court is the language of the proposed injunctive provisions or the proposed period of court oversight, the court is of course free to make appropriate revisions. And, of course, our directive to reconsider the possibility of injunctive relief should not be understood as a signal that the district court must grant any such relief, let alone any particular form of injunctive relief.

## III.

For the reasons we have discussed, we AFFIRM the jury's finding that Wal-Mart was liable for disability discrimination as well as its award of compensatory and punitive damages. We VACATE the judgment as to the denial of injunctive relief and REMAND for further proceedings consistent with this opinion.